12 F.3d 8
 COUNTY OF SENECA; Save Our Seneca; Keep Our Base in
Romulus Alive; American Federation of Government
Employees Local 2546; Seneca County
Industrial Development Agency,
Plaintiffs-Appellees,
v.
Richard CHENEY, as the Secretary of Defense; Michael Stone,
as the Secretary of the Army; Susan Livingstone,
as the Assistant Secretary of the Army,
Defendants-Appellants.
 No. 1098, Docket 92-6296.
 United States Court of Appeals,
Second Circuit.
 Argued March 1, 1993.
Decided Dec. 9, 1993.
As Amended Jan. 5, 1994.
 
 Douglas N. Letter, U.S. Dept. of Justice, Washington, DC (Stuart M. Gerson, Asst. Atty. Gen., Dennis C. Vacco, U.S. Atty., W.D. of N.Y., Buffalo, NY, of counsel), for defendants-appellants.
 Edward F. Premo, II, Rochester, NY (Jane A. Conrad, Harter, Secrest & Emery, Rochester, NY, of counsel), for plaintiffs-appellees.
 Before: NEWMAN and WINTER, Circuit Judges, and CARMAN, Judge, U.S. Court of International Trade.*
 WINTER, Circuit Judge:
 
 
 1
 The governmental defendants (hereafter "government") appeal from Judge Larimer's issuance of a preliminary injunction pursuant to the Defense Base Closure and Realignment Act of 1990 ("BRAC"), Pub.L. No. 101-510, 104 Stat. 1808, 10 U.S.C. Sec. 2687 note (Supp. III 1991), enjoining a proposed reduction in force ("RIF") at the Seneca Army Depot ("SEAD") in Romulus, New York. Judge Larimer held that the appellees ("Seneca") had demonstrated a likelihood of success on the merits of their claim that the government had circumvented the base closure process by undertaking a "realignment" of SEAD without submitting to the procedures specified in BRAC. County of Seneca v. Cheney, 806 F.Supp. 387 (W.D.N.Y.1992), vacated by order, 992 F.2d 320 (2d Cir.1993). The government argues that the proposed RIF at SEAD is not a realignment either because it does not involve the relocation of functions or civilian personnel or because it is a "workload adjustment" and, as such, is specifically excluded from the Act. BRAC Sec. 2910(5). Seneca contends that the proposed RIF is a realignment and that, even if we rule against them under BRAC, the preliminary injunction was justified under the National Environmental Policy Act ("NEPA"), 42 U.S.C. Secs. 4321 et seq. (1988), an issue that Judge Larimer did not reach. County of Seneca, 806 F.Supp. at 413.
 
 
 2
 Because the government's actions implicate neither BRAC nor NEPA, we vacated the preliminary injunction on March 9, 1993. This opinion explains that action.
 
 
 3
 SEAD is a military installation in Romulus, New York, that stores and maintains conventional and "special" weapons as well as industrial plant equipment necessary for national defense. The special weapons can include ground-launched tactical nuclear weapons[1]. In connection with these functions, a munitions maintenance unit, the 833d Ordnance Company, had been stationed at SEAD. In addition to the military personnel engaged in these tasks, SEAD has employed 847 civilians, 442 in connection with its special weapons capacity and 143 in connection with its industrial equipment function.
 
 
 4
 In the context of a general reduction in the size of American military forces during 1990 and 1991, the Department of Defense and the Army considered three changes that would impact SEAD. First, they planned to reduce SEAD's special weapons during the period 1991 to 1998. The Army Materiel Command ("AMC") ordered the Depot System Command ("DESCOM") to arrange for the consolidation and storage of the Army's special weapons at a single site, not SEAD. Second, the Department of Defense ordered that all industrial plant equipment functions be performed at Defense Logistics Agency ("DLA") facilities. Because SEAD was not a DLA facility, its industrial plant equipment mission was scheduled to be reduced, resulting in a loss of 122 civilian positions by October 1992. Finally, the 833d Ordnance Company would be deactivated in September 1992.
 
 
 5
 In August 1991, AMC ordered DESCOM to study the proposed actions in accordance with Army Regulation 5-10 ("AR 5-10") which specifies the procedures required for the reduction of civilian employment by 50 persons or 10%, whichever is less. On September 27, 1991, while this study was proceeding, President Bush ordered the Defense Department to eliminate all ground-launched tactical nuclear forces from the American arsenal. This order reoriented the Army's efforts from consolidation of the special weapons program to total elimination of ground-launched tactical nuclear weapons as a class. Consequently, the Army modified its AR 5-10 proposal to recommend that SEAD be downgraded from a depot to a "depot activity" with the concurrent elimination of the 442 civilian positions with responsibility for special weapons. The total number of civilians employed at SEAD would as a result drop from 847 to 285, a decline of nearly 70%.[2] The Secretary of the Army approved these recommendations on July 2, 1992.
 
 
 6
 On September 9, 1992, Seneca brought the present action seeking injunctive relief from the proposed RIF on the grounds that it failed to comply with BRAC. The authority for the closure and realignment of military installations (and certain limitations on that authority) derive from 10 U.S.C. Sec. 2687. It provides that:
 
 
 7
 (a) ... no action may be taken to effect or implement (1) the closure of any military installation at which at least 300 civilian personnel are authorized to be employed [or] (2) any realignment with respect to any [such] military installation ... (1) involving a reduction by more than 1,000, or by more than 50 percent, in the number of civilian personnel authorized to be employed at such military installation at the time the Secretary of Defense or the Secretary of the military department concerned notifies the Congress under subsection (b) of the Secretary's plan to close or realign such installation ... unless and until.... (b) ... the Secretary of Defense or the Secretary of the military department concerned notifies the Committees on Armed Services of the Senate and House of Representatives, as part of an annual request for authorization of appropriations to such Committees, of the proposed closing or realignment and submits with the notification an evaluation of the fiscal, local economic, budgetary, environmental, strategic, and operational consequences of such closure or realignment....
 
 
 8
 10 U.S.C. Sec. 2687(a), (b) (1988). BRAC grafts on to the requirements of Section 2687 further elaborate procedures that are effective for five years. Every two years from 1991 to 1995 the Secretary of Defense must submit recommendations for base closures and realignments to the Defense Base Closure and Realignment Commission. After studying these recommendations, the Commission must submit its own recommendations to the President who, in turn, is to relay his approval or rejection to Congress. BRAC Secs. 2903, 2904; see Specter v. Garrett, 971 F.2d 936, 940-41 (3d Cir.), vacated and remanded, --- U.S. ----, 113 S.Ct. 455, 121 L.Ed.2d 364 (1992).
 
 
 9
 It is conceded that the BRAC procedures were not followed with regard to the proposed RIF. Finding that the RIF was covered by BRAC, the district court issued a preliminary injunction. Seneca also claimed in the district court that the RIF would violate NEPA, which requires the preparation of an environmental impact statement "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. Sec. 4332(2)(C). The district court did not rule on Seneca's NEPA claim because of its disposition of the BRAC issue.
 
 
 10
 Although we review the district court's granting of a preliminary injunction for abuse of discretion, we review the court's conclusions of law de novo.[3] Disabled Am. Veterans v. United States Dep't of Veterans Affairs, 962 F.2d 136, 140 (2d Cir.1992). An injunction based on an error of law qualifies automatically as an abuse of discretion. Long Island R.R. v. International Ass'n of Machinists, 874 F.2d 901, 906 (2d Cir.1989), cert. denied, 493 U.S. 1042, 110 S.Ct. 836, 107 L.Ed.2d 831 (1990).
 
 
 11
 The government argues that the RIF planned for SEAD is not a "realignment" within the meaning of Section 2687 and is therefore not covered by BRAC. BRAC Sec. 2910(5) states: "The term 'realignment' includes any action which both reduces and relocates functions and civilian personnel positions but does not include a reduction in force resulting from workload adjustments, reduced personnel or funding levels, or skill imbalances." BRAC Sec. 2910(5); see also 10 U.S.C. Sec. 2687(e)(3).
 
 
 12
 Because SEAD's special weapons mission is not being relocated but will be eliminated altogether, the RIF, the government argues, is not a "realignment." Seneca contends that the term "realignment" includes RIFs such as that proposed for SEAD. Seneca notes that every term defined in BRAC Sec. 2910, except "realignment," is linked to its definition by the verb "means." In contrast, "realignment" is defined only to "include" actions both reducing and relocating functions and civilian personnel. Because Seneca reads "includes" to mean that actions in addition to reductions and relocations are included in the term "realignment," it asks us to hold that the RIF at issue is a "realignment."
 
 
 13
 As its argument indicates, Seneca does not offer any parameters to its interpretation of the term "realignment" that inform us as to what other actions are "include[d]." The interpretation of BRAC Sec. 2910(5) urged by Seneca and adopted by the district court would bring within BRAC's ambit every reduction of 50% of the civilian work force at a site. If that was what Congress intended, however, the term "realignment" would be superfluous. Nevertheless, we need not dwell on what else "realignment" might mean in the context of this somewhat enigmatic statute because we believe that the natural meaning of the term "realignment" does not cover the outright elimination of a function. An alignment involves the positioning of one group of functions or personnel relative to another group. A realignment thus suggests a transfer, merger, or regrouping of functions and personnel, not an elimination of one particular function with the attendant personnel. We conclude the RIF here is an elimination of one function.
 
 
 14
 As an alternative to its argument regarding the term "includes," Seneca contends that the proposed RIF at SEAD will both reduce functions and civilian personnel positions at SEAD and relocate them to the Sierra Army Depot at Herlong, California, another military installation with special weapons capacity. However, Seneca offered only a speculative affidavit in support of this factual claim in the district court. In contrast, the government offered directives from President Bush, Secretary Cheney, and their military subordinates implementing the complete elimination of the class of weapons whose storage and maintenance formerly engaged SEAD's civilian personnel. Because Seneca has offered no probative evidence that a relocation of functions and civilian personnel will take place, the RIF cannot be considered a realignment.
 
 
 15
 Finally, Seneca maintains that all RIFs announced for SEAD--consolidation of industrial plant equipment functions and deactivation of the 833d Ordnance Company, as well as reduction of the special weapons personnel--must be considered cumulatively for purposes of BRAC. This would bring the total reduction above the threshold of a 50% decrease in civilian personnel requiring the implementation of procedures under BRAC. 10 U.S.C. Sec. 2687(a)(2). However, because the special weapons RIF is not a realignment, BRAC does not apply to it, and the civilian personnel from special weapons do not count toward the threshold level.
 
 
 16
 The district court declined to rule on Seneca's claim under NEPA because it based its injunction on BRAC, County of Seneca, 806 F.Supp. at 413, which exempts base closures and realignments carried out under its authority from compliance with NEPA under most circumstances. BRAC Sec. 2905(c). Because we find that the proposed RIF is not a "realignment" subject to BRAC, however, NEPA might therefore apply and serve as a proper basis for a preliminary injunction. IIT v. Vencap, Ltd., 519 F.2d 1001, 1019 n. 34 (2d Cir.1975) (preliminary injunction may be upheld on other grounds than those relied on in district court if "other grounds would have compelled the issuance of one").
 
 
 17
 Seneca claims that the government violated NEPA by preparing neither an "environmental impact statement" ("EIS") nor an "environmental assessment" ("EA") in connection with the proposed RIF that, they assert, will affect the "quality of the human environment." 42 U.S.C. Sec. 4332(2)(C). Under NEPA, an EIS or EA is not required unless the contemplated action will affect the environment "in a significant manner or to a significant extent," with significance defined in terms of both context and intensity. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 374 & n. 20, 109 S.Ct. 1851, 1859 & n. 20, 104 L.Ed.2d 377 (1989). As movant in the district court, Seneca bore the burden of showing that the RIF will significantly affect the physical environment as opposed to the economic health of the region. Id.; Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 772, 103 S.Ct. 1556, 1560, 75 L.Ed.2d 534 (1983) ("NEPA does not require the agency to assess every impact or effect of its proposed action, but only the impact or effect on the environment.").
 
 
 18
 Seneca failed to meet this burden because it has made no showing of threatened environmental damage as opposed to economic effects. Although Seneca cites a litany of environmental problems associated with SEAD's presence in Romulus, New York, these problems were created by past actions, ironically by the very presence of SEAD that Seneca seeks to continue. NEPA, on the other hand, relates solely to future agency actions. Metropolitan Edison, 460 U.S. at 779, 103 S.Ct. at 1564. Moreover, reductions of civilian personnel staffing levels are defined by the Army as a type of action categorically excluded pursuant to 40 C.F.R. Sec. 1507.3(a), (b)(2)(ii) from NEPA's mandates so long as they (1) fall below the threshold for reportable actions, (2) will not result in the abandonment of the facility or disruption of environmental services, or (3) do not otherwise require an EIS or EA. 32 C.F.R. Secs. 651.18 & 651 app. A-14 (1993). None of these conditions obtains and Seneca has not shown the Army acted arbitrarily and capriciously in applying a categorical exemption to the RIF, Marsh, 490 U.S. at 375-76, 109 S.Ct. at 1860-61, and in filing its Record of Consideration demonstrating the lack of environmental effect. For these reasons, Seneca has failed to show a likelihood of success on the merits on its claim that the proposed RIF violates NEPA.[4]
 
 
 19
 We therefore confirm our prior order vacating the preliminary injunction.
 
 
 
 *
 The Honorable Gregory W. Carman, Judge of the U.S. Court of International Trade, sitting by designation
 
 
 [1]
 Department of Defense policy is neither to confirm nor deny the presence of nuclear weapons at specific military installations
 
 
 [2]
 Civilian employees whose jobs would be eliminated would be eligible for various assistance programs including the Priority Placement Program that aids transfers to other defense facilities and early retirements under the Voluntary Early Retirement Authority
 
 
 [3]
 We hold that the issues raised in the instant matter are justiciable for the reasons stated in Specter v. Garrett, 995 F.2d 404 (3d Cir.), cert. granted, --- U.S. ----, 114 S.Ct. 342, 126 L.Ed.2d 307 (1993)
 
 
 [4]
 We do not order dismissal of the complaint because the issue of whether functions and personnel will be relocated to the Sierra Army Depot at Herlong, California, is a factual issue. Seneca's evidentiary presentation was insufficient to support a preliminary injunction, but we cannot convert that proceeding, in which Seneca bore the burden, into a motion for summary judgment against it, see Fed.R.Civ.P. 56, on which the government would bear the burden