### INDEPENDENT GUARD ASSOCIATION OF NEVADA, LOCAL NO. 1, Plaintiff–Appellant,

v.

**Hazel O'LEARY,\* Secretary of Energy of the United States of America, on Behalf of the UNITED STATES DEPARTMENT OF ENERGY, an executive department of the United States of America, Defendant–Appellee.**

No. 93–15769.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 3, 1994.

Decided June 12, 1995.

---

\* Hazel O'Leary, the current Secretary of Energy, is substituted for former Secretary James D. Wat-

kins. *See* Fed.R.App.Pro. 43(c)(1).

district court's grant of summary judgment to the Secretary of Energy in IGAN's suit to enjoin the application of the Department of Energy's ("DOE" or "agency") Nuclear Explosive Safety Order 5610.11 (Oct. 10, 1990) ("Order"). IGAN objected to the DOE's promulgation of the Order, which is an extensive personnel regulation, without the prior notice and comment required by the Administrative Procedure Act's ("APA") rulemaking procedures, 5 U.S.C. § 553. The district court held that the "military function" exception, 5 U.S.C. § 553(a)(1), to the APA applied. We reverse because our law requires APA exceptions to be construed narrowly, and the record fails to disclose that these guards perform any function directly related to the manufacture or development of military weapons by the DOE.

## BACKGROUND

IGAN is a union representing the armed civilian guards employed by Wackenhut Services, Inc. The DOE contracted with Wackenhut to guard its facilities at the Nevada Test Site near Mercury, Nevada, and its support facilities in Las Vegas, Nevada. At these sites, the DOE researches, produces and tests nuclear explosive devices for use by the military. Wackenhut, not the DOE, hires and supervises the guards.

On October 10, 1990, the DOE issued the Order pursuant to its statutory authority to maintain security and safety standards for its defense programs. *See, e.g.*, 42 U.S.C. §§ 2165, 2201. The Order applies to all activities and operations involving nuclear explosives and nuclear weapons conducted under the Department's nuclear program. The DOE did not comply in full with the APA's normal rulemaking procedures, which would have entailed prior notice and comment of the entire Order. *See* 42 U.S.C. § 7191.

The Order provides management policy guidance for the selection and certification of personnel; sets forth nuclear explosive safety standards and rules; and provides for nuclear explosive safety studies and surveys. In

George A. Pappy, Pappy & Davis, Los Angeles, CA, for plaintiff-appellant.

L. Dow Davis and Monte N. Stewart, U.S. Dept. of Energy, Washington, DC, for defendant-appellee.

Before: SCHROEDER and RYMER, Circuit Judges, and DWYER,** District Judge.

SCHROEDER, Circuit Judge:

The Independent Guard Association of Nevada, Local No. 1 ("IGAN"), appeals the

** Honorable William L. Dwyer, United States District Judge for the District of Western Washington, sitting by designation.

the portion relevant here, the Order establishes a Personnel Assurance Program ("PAP") applicable to all DOE and contractor employees assigned nuclear explosive duties. The PAP provides detailed certification requirements for the DOE and its contractor personnel who are certified to guard nuclear explosive devices in Nevada. For example, PAP disqualifies persons from such duties who fail to comply with any of its provisions, which include submission to laboratory testing, random drug testing, and a certification review procedure. PAP also provides for permanent disqualification from duty for any employee who has ever used hallucinogens, regardless of quantity consumed or remoteness in time.

The Order superseded an earlier safety program promulgated in 1980 that had delegated more responsibility for contractor employee qualification review to the contractor itself. *See* "Program to Prevent Accidental or Unauthorized Nuclear Explosive Detonations," DOE Order 5610.3 (Dec. 18, 1980).[1] Shortly after the Order went into effect, it resulted in the disqualification of four employees because of prior use of a "hallucinogen." DOE subsequently "suspended" the hallucinogen provision, and all four employees were certified for nuclear explosive safety duties.

On March 10, 1992, IGAN filed a complaint seeking declaratory and injunctive relief, pending compliance with notice and comment procedures.[2] The case came before the district court on cross-motions for summary judgment. The DOE invoked the "military function" exception to the APA's notice and comment provisions. This exception provides:

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

(1) a military or foreign affairs function of the United States;

5 U.S.C. § 553(a)(1). Because the parties agreed on the material facts, the case turned on a legal question: the proper scope of this exception.

In granting the DOE's motion for summary judgment, the district court determined that the DOE's authorization to conduct the research and production of nuclear weapons constituted a military function. The court further found that "the proper conduct of a military function often requires essential, though non-military, support functions," and that "such military functions cannot proceed absent full regulation and control of the support function." The district court did not find that the guards themselves performed a military function. Rather, the district court concluded that the exception applied because the Order deals with "an essential integral support program that is required for the proper conduct of the DOE's military function of researching and testing nuclear weapons."

## DISCUSSION

■ The Secretary initially stresses that DOE has "suspended" the "hallucinogen" provision, the only portion of the Order IGAN protested, and that it has certified for nuclear explosive safety duties the four individuals who had been temporarily disqualified pursuant to this provision. The Secretary also advises that DOE has committed to publish for notice and comment the hallucinogen rule should it ever be reimplemented. Thus, the Secretary argues, IGAN has sustained no legally cognizable injury from the Order, and the district court should have dismissed the case. We agree with the district court that the Secretary's suspension of the provision, and subsequent certification of the affected personnel, does not wholly resolve IGAN's problem. As IGAN notes, the APA makes no provision for "suspension" of rules. Consequently, despite reassurances that lack the force and effect of law, the

---

1. The Order also superseded those portions of a 1979 DOE order addressing nuclear explosives. *See* "Packaging and Transporting of Nuclear Explosives, Nuclear Components, and Special Assemblies," DOE Order 5610.1 (Sept. 11, 1979).

2. IGAN also sought to enjoin implementation of "Personnel Security Assurance Program," DOE Order 5631.6 (Jan. 19, 1989). This claim had been mooted, however, by the DOE's 1989 Notice of Proposed Rulemaking on that program, known as the PSAP.

DOE could, at some future date, reinstate the "hallucinogen" provision without notice and comment if we were not to rule on the issue. We thus conclude that IGAN has standing to maintain this suit.

The district court's interpretation of the scope of the "military function" exception is a question of law that we review de novo. *See United States v. Yacoubian*, 24 F.3d 1, 3 (9th Cir.1994). Section 553(a)(1) provides an exception to the APA "to the extent" that a military function is involved. The statute never defines the term, but its language contemplates that "military function" has measurable contours. The statute's text strongly suggests that those contours are defined by the specific function being regulated.

Our inquiry therefore is not advanced by IGAN's threshold contention that the DOE's status as a "civilian" agency is dispositive. The DOE's statutory mandate includes responsibility for research and development of all energy resource applications, as well as national security functions relating to nuclear weapons research and development. 42 U.S.C. § 7112, 7133. The DOE can and does perform both "civilian" and "military" functions. The agency's dual nature reinforces the critical importance of the statutory language that instructs us to look not to whether the overall nature of the agency promulgating a regulation is "civilian" or "military," but to the function being regulated. Legislative history confirms this view. *See* S.Rep. No. 752, 79th Cong., 1st Sess. 13 (1945) (noting the suggestion that all functions of the War and Navy Department as well as the Army and Navy should be exempted, but finding that "since the bill relates to functions, rather than agencies, it would seem better to define functions"). The district court correctly concluded that the DOE engages in a military function when it researches and develops nuclear weapons. *See* 42 U.S.C. § 2121 (authorizing the Atomic Energy Commission, precursor to the Energy Research and Development Administration, whose functions were subsequently assumed by the DOE, to engage in the research and development of nuclear weaponry).

■ We thus agree with the Secretary that the exception applies to predominately civilian agencies such as DOE when they are performing a "military function". The issue before us, however, is whether the civilian guards who are the subject of this challenged regulation fall within the military function exception. The Secretary does not seriously argue that the Wackenhut guards themselves are performing a military function. Instead, she argues that the military function exception logically should be seen to encompass IGAN's contractor support function because the DOE "could not safely and securely accomplish its military function" without the safety policies embodied in the Order. In short, the Secretary argues for a broad interpretation of the exception.

The legislative history of the APA is contrary to the Secretary's view. Congress intended the military function exception to have a narrow scope. The Report of the Senate Judiciary Committee emphasized that "the exceptions apply only 'to the extent' that the excepted subjects are *directly* involved." S.Doc. No. 248, 79th Cong., 2d Sess. 199 (1946) (emphasis added). The Judiciary Committee continued:

> The exemption of situations of emergency or necessity is not an "escape clause" in the sense that any agency has discretion to disregard its terms or the facts. A true and supported or supportable finding of necessity or emergency must be made and published. "Impracticable" means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings.

*Id.* at 200.

Consistent with congressional intent, this Circuit has ruled that exceptions to the APA must be narrowly construed:

> The exceptions to section 553 will be "narrowly construed and only reluctantly countenanced." This is consistent, of course, with Congress's clear intent to preserve the statutory purpose of informal rulemaking by making sure those exceptions did not become "escape clauses," ... which an agency could utilize at its whim.

*Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir.1984) (citations omitted).

To our knowledge, no court has ever considered whether the military function exception applies to civilian contractors. The dearth of authority discussing the applications of the military function exemption suggests it has not been widely invoked.

The two cases cited in the district court's decision are, as the district court itself correctly recognized, inapposite. In *McDonald v. McLucas,* 371 F.Supp. 837 (S.D.N.Y.1973), plaintiffs challenged as violative of the APA the procedures by which the armed forces declare American servicemen missing in action to be dead. The court summarily ruled that the military function exception applied to the regulation, and the APA was thus inapplicable. *Id.* at 840. *McDonald* involves a military determination concerning military personnel who had participated in a military conflict, and did not speak to contractor support functions.

*County of Seneca v. Cheney,* 806 F.Supp. 387 (W.D.N.Y.1992), *vacated,* 992 F.2d 320 (2d Cir.), opinion reported in 12 F.3d 8 (2d Cir.1993), is even less authoritative. The vacated district court opinion simply cited a House Conference Report's unexceptionable statement that the decision to close and realign military bases is a military function. *Cheney,* 806 F.Supp. at 399 n. 9.

■ The legislative history and relevant case law direct that exceptions to the APA be narrowly construed, and that the exception can be invoked only where the activities being regulated directly involve a military function. If the Secretary's position were adopted, and contractor support activities held to be within the scope of the military function exception, maintenance staff, custodial help, food service workers and even window washers could find their undoubtedly necessary support tasks swept within the exception's ambit, and DOE regulations affecting their employment exempt from notice and comment. Neither the statute, nor common sense, requires such a result.

■ We do not mean to imply that the military function exception can never apply to a contractor's services. Indeed, at argument IGAN conceded that contractor employees could perform a military function within the meaning of the APA. For example, if they were making military weapons, they might well be performing such a function. The record in this case, however, does not contain any evidence that the military has ever exercised any direct supervisorial control over the activities of these civilian contract guards. The record shows that the guards employed and supervised by Wackenhut were performing duties similar to those performed by civilian security guards everywhere. They were no more performing a "military function" than civilian contract guards employed to guard judges are performing a "judicial function." The exemption should not be stretched to encompass civilian support services.

Finally, we note that, as a practical matter, compliance with the APA imposes costs on the Secretary that are minimal in nature. Following publication of the proposed rule in the Federal Register, the Secretary need only provide 30 days for notice and comment. 42 U.S.C. § 7191(b)(1). After this notice and comment period, the Secretary may publish the proposed rule or modification of it with an accompanying "explanation responding to the major comments, criticisms, and alternatives offered during the comment period." *Id.* § 7191(d).

We REVERSE the district court's judgment that the DOE properly availed itself of the military function exemption. The district court did not consider the other exemptions to the APA proffered by the Secretary, *see* 5 U.S.C. §§ 553(a)(2), (b)(3)(A), and we REMAND for that purpose.

REVERSED and REMANDED.