The FUND FOR ANIMALS, et al.

v.

Bruce BABBITT, et al.

No. Civ. 1:94CV301.

United States District Court,
D. Vermont.

Oct. 4, 1996.

Beth Robinson, Langrock, Sperry & Wool, Middlebury, VT, Kimberley K. Walley, Eric R. Glitzenstein, Myer & Glitzenstein, Washington, DC, for Plaintiffs.

Helen M. Toor, Asst. U.S. Atty., Office of U.S. Atty., Dist. of Vermont, Burlington, VT, for Defendants.

### RULING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

(paper 39)

MURTHA, Chief Judge.

The plaintiffs, which include several individuals and environmental groups, have brought this action to challenge the federal government's alleged failure to evaluate the environmental consequences of Vermont's recently instituted annual moose hunts, as allegedly required by the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (hereinafter "NEPA"). This dispute is before this Court on remand after the Second Circuit's reversal of Judge Billings' dismissal of the action as moot. *See generally Fund for Animals v. Babbitt,* 89 F.3d 128 (2d Cir. 1996).[1] Upon issuance of the mandate, the plaintiffs filed the instant Motion for Preliminary Injunction by which they seek to halt this year's moose hunt scheduled for October 12–15, 1996. For the reasons set forth below, the Plaintiffs' Motion for a Preliminary Injunction is DENIED.

### I. Background

The Second Circuit's opinion and Judge Billings' Opinion–Order (paper 33) discuss the statutory framework underlying this action and set forth the background of moose hunting in the State of Vermont. *See Fund For Animals,* 89 F.3d at 129–32; *Fund for Animals v. Babbitt,* Opinion–Order, Civil No.

5:94CV301 (D.Vt. July 6, 1995) (paper 33). Familiarity with these opinions is presumed.

In addition, the record before the Court includes the testimony presented at the hearing conducted on September 27, 1996, as well as affidavits and exhibits which were attached to the parties' filings addressing the Motion for Preliminary Injunction or appended to the Motion for Summary Judgment considered by Judge Billings. Upon review of the present record, the Court makes the following findings as relevant to the pending motion. *See* Fed.R.Civ.P. 65(a)(2).

Because of a drastic decline in Vermont's moose population, in 1896 Vermont enacted a ban on moose hunting. However, by the 1970's the moose population began to show signs of recovery. Accordingly, in 1980 the Vermont Department of Fish and Wildlife (hereinafter "VDFW") initiated a study of the state's moose to gauge the health of the moose population and to respond to those who wanted moose hunting reinstated.

Upon completion of the study in 1985, the VDFW concluded the moose population could not support a hunt. However, by 1992, the VDFW reversed its position.

The VDFW conducted research and concluded that Vermont has a healthy moose herd which is increasing in number and distribution throughout Vermont, particularly in the northeastern portion of the state. The VDFW also conducted surveys and meetings with state residents and found residents wish to maintain an expanding moose population. However, comments of northeastern Ver-

---

1. The Second Circuit "remand[ed] to the district court for consideration of the standing issue, and, if appropriate, of the merits of plaintiffs' case." 89 F.3d at 135. Therefore, despite plaintiffs' strenuous arguments to the contrary, this Court reads the Second Circuit's opinion as solely addressing the issue of mootness, and not as dispositive of any substantive issues remaining in this case.

The plaintiffs did not brief the issue of standing in its Motion for Preliminary Injunction. Although the Government did address the issue in its response to the preliminary injunction motion, the record is little more complete on the issue of standing than it was when the case was before Judge Billings. *See id.* ("This issue has not been fully briefed to this court, and plaintiffs claim that they are entitled to further discovery before a decision is made.") (footnote omitted).

Accordingly, the Court presently makes no finding on the issue of each plaintiff's standing to pursue this action, and, assuming at least one of the named plaintiffs possesses standing, limits its inquiry to the issue of whether plaintiffs have demonstrated entitlement to injunctive relief. *See The Fund for Animals, Inc. v. Espy,* 814 F.Supp. 142 (D.D.C.1993) (finding the Fund for Animals and several individuals living in the vicinity of the study site had standing to seek a preliminary injunction to prevent implementation of a research study involving capture of pregnant wild bison); *see also* Federal Defendants' Reply Memorandum (to plaintiffs' summary judgment motion) (paper 30) at 12 n. 6 ("[T]he Federal Defendants argued only that the two *organizational* plaintiffs had failed to allege sufficient injury to meet the threshold requirements for standing.") (emphasis in original).

mont residents suggested a need to stabilize the moose population in Essex County because of increasing motor vehicle-moose collisions and local agricultural damage.

After balancing the interests of hunters and other residents, the VDFW determined that a hunt, limited to the area around Essex County and subject to yearly review, would provide economic and recreational benefits and help stabilize increasing conflicts with moose and Essex County residents. *See generally* Moose Management Plan for the State of Vermont 1992–1996 (appended to paper 16 as exhibit 2 and Injunction Hearing Exhibit 4).

On December 22, 1992, the Vermont Fish and Wildlife Board began proceedings to initiate a moose hunting season. The Vermont Legislative Rules Committee approved the moose hunt rules on May 4, 1993, and the Fish and Wildlife Board issued its final approval on May 19, 1993. The United States Fish and Wildlife Service was not involved in any of these decisions. *See* Affidavit of Cedric Alexander (paper 31) at paras. 2–3.

In October 1993, Vermont held its first moose hunt in almost 100 years. Significantly, Vermont's moose hunt took place prior to the state's receipt of approval of any federal funding for the Moose Investigations Project of which the hunt is a part.

In June 1993, the VDFW first applied for funding from the Federal Fish and Wildlife Service to assist in funding portions of its five-year Moose Investigations Project. The Grant Proposal which Vermont submitted contained an application form, a "program narrative," and a copy of Vermont's 1992–1996 Moose Management Plan.

In the Grant Proposal the VDFW sought funding for research and data collection, such as checking moose health and recording moose sightings. It also sought funding for various public education activities. Under its reimbursement procedure, the United States Fish and Wildlife Service reimburses the state for 75% of the costs the state incurs to administer funded activities.

The Wildlife Program Regional Chief for the United States Department of Interior Fish and Wildlife Service, Division of Federal Aid, John Organ, reviewed the proposal and determined that it was "categorically exclud-ed" from NEPA procedures under 40 C.F.R. § 1508. Specifically, he determined the Grant Proposal was categorically excluded from NEPA review because it consisted of "non-destructive data collection, inventory . . . study, research and monitoring activities" and "[p]ersonnel training, environmental interpretation, public safety efforts and other educational activities" and did not otherwise fall within any of the exceptions to the categorical exclusions. Affidavit of John F. Organ (paper 23) at para. 17.

Admittedly, though not surprisingly, Mr. Organ's decision that the Grant Proposal was categorically excluded is inadequately supported by documentary evidence. *See* 40 C.F.R. § 1500.4(p) (categorical exclusions employed to "reduce excessive paperwork"); *see also City of New York v. I.C.C.*, 4 F.3d 181, 185 (2d Cir.1993) (suggesting that, absent extraordinary circumstances, categorical exclusions require little further agency analysis). Nevertheless, at the September 27, 1996 hearing and in his previously-filed affidavit, Mr. Organ explained that, in making his decision, he relied upon the information supplied by the Grant Proposal itself, as well as on conversations with VDFW employees.

In February 1994, the Government issued its notice approving the requested funding of the Vermont's Moose Investigations Project. *See* Affidavit of Cedric Alexander at para. 4. However, John Organ had erroneously approved federal funding of portions ineligible for funding because they related directly to the issuance of hunting licences and permits.

Subsequently, the Government ceased its funding of ineligible activities, a fact which prompted Judge Billings to conclude the plaintiffs' claims are moot. However, still at issue are three portions of the Program which currently receive federal funding: (1) periodic public information-gathering meetings in selected Wildlife Management Units; (2) preparing recommended moose hunt regulations; and (3) developing a mandatory hunter training workshop and conducting two pre-hunt workshops annually. *See* 89 F.3d at 133.

According to Vermont's Commissioner of Fish and Wildlife, even if all federal funding of the research and educational activities as-

sociated with the Moose Investigations Project were withdrawn, moose hunting would continue in Vermont because the state legislature has approved an application fee to fund the hunt. *See* Affidavit of Allen A. Elser (paper 32). The Federal Fish and Wildlife Service reviews the state's reports yearly and at times may make recommendations concerning funded portions of the Program; however, it apparently does not actively oversee or participate in the funded projects.

Furthermore, the state continues to consider the opinions and attitudes of Vermont residents and to gauge their perceptions of the VDFW's various species management plans and related issues, such as moose and deer hunting. *See* February 1996 Responsive Management Survey, Injunction Hearing Exhibit 6. According to the VDFW's most recent survey, "Vermont adult residents are supportive of the Department's use of regulated hunting to manage the moose herd in Vermont. Half of the respondents strongly supported moose hunting, 30% moderately supported, 5% moderately opposed, 9% strongly opposed, 2% had no opinion, and 5% did not know." *Id.* at 42.

## II. Discussion

### A. Irreparable Harm

A party seeking injunctive relief ordinarily must show: (a) It will suffer irreparable harm in the absence of an injunction; and, (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *See, e.g., Polymer Technology Corp. v. Mimran,* 37 F.3d 74, 77–78 (2d Cir.1994); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (1979) (per curiam). The plaintiffs have pursued their claim to injunctive relief by attempting to demonstrate irreparable harm and a likelihood of success on the merits. *See generally* Paper 39 at 25, 36; *see also N.A.A.C.P., Inc. v. Town of East Haven,* 70 F.3d 219 (2d Cir.1995) ("[T]he fair-ground-for-litigation prong may not be considered where the moving party seeks to stay governmental action taken in the public interest or pursuant to a statutory or regulatory scheme.") (citation and quotation omitted).

A showing of irreparable harm is a prerequisite to the granting of a preliminary injunction. *See, e.g., Grand Light and Supply Co., Inc. v. Honeywell, Inc.,* 80 F.R.D. 699, 702 (D.Conn.1978). "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Tom Doherty Associates, Inc. d/b/a Tor Books v. Saban Entertainment, Inc.,* 60 F.3d 27, 37 (2d Cir.1995) (citation and quotation omitted). Here, the plaintiffs have not carried their burden of demonstrating irreparable harm.

Plaintiffs allege two types of injury: (1) a "procedural injury" based upon the defendants' failure to comply with NEPA, and (2) an "aesthetic injury" based upon the asserted adverse effects experienced by individuals who wish to observe, photograph, study and paint moose. As to the first type of injury, the plaintiffs clearly are not entitled to injunctive relief based upon the defendants alleged violation of NEPA's procedural requirements. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573 n. 8, 112 S.Ct. 2130, 2143 n. 8, 119 L.Ed.2d 351 (1992) (Plaintiff must show "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing.")

Furthermore, the plaintiffs have not demonstrated they will suffer irreparable injury if this year's hunt commences. The plaintiffs have presented virtually no concrete evidence to support their contention that their ability to view or photograph moose will be impaired as a result of the proposed limited hunt. In fact, both District Wildlife Biologist Cedric Alexander and Certified Wildlife Biologist Scott Williamson persuasively testified that the state's moose population continues to increase each year and that, thus far, the moose hunts have not decreased the moose population, but rather have only decreased the rate of population growth in the Essex County area. Thus, even if this year's moose hunt takes place, it

is likely there will be more moose in Vermont next year.

Plaintiffs have raised some legitimate questions concerning the proper way to compute Vermont's moose population. However, all agree that no one can estimate the current population with absolute certainty. On the current record, the Court finds the state's computations, and the conclusions drawn therefrom, supportable and rational. Plantiffs' predictions of increased difficulty in finding and viewing moose constitute little more than unsubstantiated speculation. Based on the evidence presently before the Court, it is questionable as to whether any of the named plaintiffs will suffer any injury as a result of the hunt.

### B. Likelihood of Success on the Merits

■ Even assuming the plaintiffs could demonstrate potential irreparable harm, at this time they have not demonstrated a likelihood of success on the merits of their claim that the Government has failed to comply with NEPA.

The parties have failed to cite any cases which directly address the relationship between the Wildlife Restoration Act, 16 U.S.C. §§ 669–669i (hereinafter "WRA") and NEPA under circumstances similar to those presented in this case. Despite the apparent novelty of the issues before the Court, the parties have assumed NEPA is applicable. On the present record, the Court is not so sure.

■ NEPA requires federal agencies to consider the environmental consequences of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). When complying with this directive, federal agencies are guided by regulations promulgated by the Council on Environmental Quality, as set forth in 40 C.F.R. §§ 1500.17. The actions of nonfederal defendants are also subject to NEPA if they have entered into a partnership or joint venture with the federal government. See, e.g., Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1397 (9th Cir.1991).

■ "Under NEPA, an [environmental impact statement] or [environmental assessment] is not required unless the contemplated action will affect the environment "in a significant manner or to a significant extent,"

with significance defined in terms of both context and intensity." County of Seneca v. Cheney, 12 F.3d 8, 12 (2d Cir.1993) (quoting Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). "The requirements of NEPA, which include, among other things, the submission of an [environmental impact statement], apply only when the federal government's involvement in a project is sufficient to constitute 'major Federal action.'" Save Barton Creek Association v. Federal Highway Administration, 950 F.2d 1129, 1133 (5th Cir.), cert. denied, 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992).

■ No clear standards exist for defining the point at which federal participation transform a state project into "major Federal action." Almond Hill School v. United States Department of Agriculture, 768 F.2d 1030, 1039 (9th Cir.1985). The use of federal funding is certainly a factor which may make an entire state project sufficiently federal so as to require compliance with NEPA. Id.; accord United States v. Southern Florida Water Management District, 28 F.3d 1563, 1573 (11th Cir.1994), cert. denied, 514 U.S. 1107, 115 S.Ct. 1956, 131 L.Ed.2d 848 (1995). However, "[t]he touchstone of major federal action ... is an agency's authority to influence significant nonfederal activity." Sierra Club v. Hodel, 848 F.2d 1068, 1089 (10th Cir.1988).

■ Throughout this litigation the plaintiffs have argued that Vermont's Moose Investigations Project is subject to NEPA's requirements because the State accepts 75% of the money needed to run portions of the program from WRA funds. As noted ·by Judge Parker, such funding constitutes "unambiguous [federal] involvement." See 89 F.3d at 133. However, such involvement in seemingly collateral activities does not lead ineluctably to the conclusion that the hunt itself constitutes a "major Federal action."

Federal funding of one part of a large and general project does not render the entire project a major federal action.... Courts have consistently declined to extend NEPA to state or local projects that are not federally funded, even if those

projects are related to or necessitated by federal projects.

*Proffitt v. Department of Interior ex rel. Lujan,* 825 F.Supp. 159, 162 (W.D.Ky.1993) (citations omitted). Even "[w]here a non-federal party voluntarily informs a federal agency of its intended activities to ensure they will comply with law and regulation, and to facilitate the agency's monitoring of the activities for safety purposes, the agency's review of the plan does not constitute a major federal action." *State of New Jersey Department of Environmental Protection and Energy v. Long Island Power Authority,* 30 F.3d 403, 416 (3d Cir.1994). In short, "[w]here the actions at issue have been taken by state authorities without substantive federal supervision, authorization, commitment, or control, and will never be subject to review or approval by a federal agency, there can be no finding of 'major Federal action' within the meaning of NEPA." *Save Barton Creek,* 950 F.2d at 1144.

Here, by its very terms, the WRA is a grant program which seems to contemplate partial funding of certain activities established and run by participating states. *See* 16 U.S.C. § 669g(b) ("The non-Federal share of such costs may be derived from license fees paid by hunters, but not from other Federal grant programs."); 50 C.F.R. § 80.12 ("Federal participation is limited to 75 percent of eligible costs....") In fact, only two types of projects are explicitly set forth as eligible for funding: "(1) Projects having as their purpose the restoration, conservation, management, and enhancement of wild birds and wild mammals...." and "(2) Projects having as their purpose the education of hunters and archers in the skills, knowledges, and attitudes necessary to be a responsible hunter or archer." 50 C.F.R. § 80.5(a).

It is true that a participating state "must agree to and certify that it will comply with all applicable Federal laws...." 50 C.F.R. § 80.21. Nevertheless, it is clear that it is the state, and not the federal agency, that controls activities under any partially-funded program:

In the conduct of activities funded under the Acts, the State is responsible for:

(a) The supervision of each project to assure it is conducted as provided in the project documents, including:

(1) Proper and effective use of funds.

(2) Maintenance of project records.

(3) Timely submissions of reports.

(4) Regular inspection and monitoring of work in progress.

(b) The selection and supervision of project personnel to assure that:

(1) Adequate and competent personnel are available to carry the project through to a satisfactory and timely completion.

(2) Project personnel perform the work to ensure that time schedules are met, projected work units are accomplished, other performance objectives are being achieved, and reports are submitted as required.

(c) The accountability and control of all assets to assure that they serve the purpose for which acquired throughout their useful life.

(d) The compliance with all applicable Federal, State, and local laws.

(e) The settlement and satisfaction of all contractual and administrative issues arising out of procurement entered into.

50 C.F.R. § 80.18.

In this case, Vermont developed the moose hunt component of its Moose Investigation Project prior to receiving WRA funds and without the influence of any federal agency. This fact, when viewed in light of the state's independence in carrying out both funded and unfunded activities, suggests the plaintiffs must rely on more than the fact that Vermont's Moose Investigations Project receives federal funds. *See United States v. Southern Florida Water Management District,* 28 F.3d at 1573 ("In sum, the federal government does not posses the requisite control to federalize a project when the state agencies retain their state law authority to make the decisions concerning the project.")

*Scottsdale Mall v. State of Indiana,* 549 F.2d 484 (7th Cir.1977), *cert. denied,* 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978), does not compel a different conclusion. In *Scottsdale Mall,* the court found an entire highway bypass project was a major federal action within the meaning of NEPA, despite the state having withdrawn the project from

federal funding consideration. The court opined: "If Indiana had not long ago sought federal funding for the bypass project, had not programmed the project for federal assistance, sought and received federal approval of the location and design stages, received federal funds for preliminary engineering studies, and had not begun right-of-way acquisition, but rather had proceeded ·with these various phases of the project on its own, the result in this case might have been different." *Id.* at 489–90. By contrast, in this case, Vermont initiated the moose hunt on its own, prior to receiving federal funding, and runs the hunt without apparent federal oversight.

 Nevertheless, even assuming the defendants are subject to NEPA, the plaintiffs have not demonstrated a likelihood·of success on their claim that the Federal Wildlife Service improperly applied categorical exclusions in this case. Upon review, the Court may not substitute its judgment for that of the agency, and a federal agency's determination that a categorical exclusion applies is entitled to deference. *See City of New York,* 4 F.3d at 186. The only question is whether the agency's determination was arbitrary and capricious. *See, e.g., County of Seneca v. Cheney,* 12 F.3d at 12.

 Excluding consideration of the hunt itself, the Court cannot conclude the plaintiffs are likely to succeed on the theory that the remaining, federally-funding activities do not meet the criteria for categorical exclusion. Having reviewed Mr. Organ's affidavit and testimony, and given that one purpose of categorical exclusions is to reduce paperwork, the Court concludes Mr. Organ's explanation of how he reached his decision is not an impermissible post hoc rationalization. *See, e.g., Citizens to Preserve Overton Park v. Volpe, Inc.,* 401 U.S. 402, 420–21, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Moreover, the applicability of the categorical exclusions cited by Mr. Organ is supported by the record.

 At this hearing, the plaintiffs have not met their burden of presenting evidence to dispel the defendants' contention that the data collection activities at issue, such as weighing and measuring moose and checking for infection, are anything other than permissible research activities which, in and of

themselves, do not cause moose mortality. Likewise, the plaintiffs have not presented evidence suggesting the·state's planned educational activities for hunters are designed primarily to address anything other than hunter safety and data collection. As explained in the state's 1995 Moose Season Proposal:

> The Team proposes to replace the 4–5 hour moose hunter training seminar with a moose hunter's handbook similar to what Maine uses to inform and educate their [sic] hunters . . . .

> Maine's Moose Hunter's Guide is an approximately 8.5″ × 7″, 20 page booklet which includes moose hunting laws and regulations, general hunting laws, descriptions and maps of hunting zones, registration information, information and drawing of how to collect ovaries, helpful hints, phone numbers, meat processing facilities, a history of moose management in Maine, a cadmium advisory, and a section on hunter ethics.

Preliminary Injunction Exhibit 5 at 3; *but see* Paper 16 at Exhibit 13, p. 4 (Without elaboration, state's agenda for its 1993 seminar lists a 15 minute segment addressing firearm selection and shot placement); *cf.* 89 F.3d at 134 n. 1 ("If plaintiffs can point to evidence suggesting that the government is instructing hunters in firearm placement and shot selection, . . . they might successfully argue that the federal government is in effect contributing funding to the moose hunt itself.") Finally, while the plaintiffs have proffered affidavits presenting their personal disagreement with the Moose Investigations Project, the defendants have countered with survey data which suggests a substantial majority of Vermonters approve of the Project, including the moose hunt. In short, plaintiffs' personal objections are insufficient to create "highly controversial" environmental impacts under NEPA. *See Hanly v. Kleindienst,* 471 F.2d 823, 830 and n. 9 (2d Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) ("Controversial" should not be equated with "neighborhood opposition.")

### III. Conclusion

The plaintiffs' Motion for a Preliminary Injunction (paper 39) is DENIED.

SO ORDERED.