06-4265-cr
United States v. Baldwin

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2006

(Argued: June 11, 2007          Decided: July 23, 2007)

Docket No. 06-4265-cr

- - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

              Appellee,

       -v.-

JEROME K. BALDWIN, also known as Jerome
Baldwin, also known as Brucey B,

              Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - -x

     Before:      JACOBS, Chief Judge, WESLEY and GIBSON,[*]
                  Circuit Judges.

     Appeal from a judgment of conviction entered in the

District Court for the District of Connecticut (Dorsey, J.).

     AFFIRMED.

                              DEIRDRE A. MURRAY, Assistant
                              Federal Public Defender (Paul F.
                              Thomas, on the brief), for
                              Thomas G. Dennis, Federal Public

_____

     [*] The Honorable John R. Gibson, Circuit Judge, United
States Court of Appeals for the Eighth Circuit, sitting by
designation.

Defender, New Haven, CT, <u>for Defendant-Appellant</u>.**

ERIC J. GLOVER, Assistant United States Attorney (William J. Nardini, <u>on the brief</u>), <u>for</u> Kevin J. O'Connor, United States Attorney, District of Connecticut, <u>for Appellee</u>.

DENNIS JACOBS, <u>Chief Judge</u>:

When a driver heeds a police order to stop only to drive away as the police approach, has the driver been seized within the meaning of the Fourth Amendment? We hold that a seizure requires submission to police authority, and conclude that the driver's initial fleeting stop does not amount to such submission. We therefore affirm the denial of the driver's motion to suppress evidence found on his person and in his car, and affirm the conviction entered in the District Court for the District of Connecticut (Dorsey, <u>J.</u>).

**I**

---

** After this appeal was fully briefed, the defendant sent the federal public defender a letter which he insisted be read during the defendant's allotted time for oral argument. Counsel then moved to withdraw. We granted the motion and took defendant's letter on submission.

On the afternoon of September 4, 2005, an anonymous caller told the New Haven police that two black men, one wearing a white t-shirt, were carrying firearms. The caller reported that they were standing next to a grey or silver Chevrolet Impala with Virginia license plates, parked on Downing Street, near an intersection with Bailey Street. The location is adjacent to the Quinnipiac Terrace housing complex, which has been plagued by the sale of guns and illicit drugs. According to the tipster, the men had "big guns, real real big guns, serious."

Police officers Plowman and Donnelly found no one at the reported location; but as they drove along Downing Street, they saw a grey car oncoming which had no front license plate. As it approached, the officers observed that the driver was a black man (later identified as Jerome Baldwin) wearing a black t-shirt, but could not see any passengers. As the car passed, the officers identified it as a silver 2001 Chevrolet Impala bearing a Virginia license plate on the rear; they turned on their overhead lights and siren and pursued.

The Impala stopped after turning left onto Bailey Street and the marked patrol car pulled up behind it. As

3

Plowman and Donnelly approached the Impala on foot, the driver (Baldwin) leaned out the window and peered back at them. Plowman instructed Baldwin to show his hands, but he simply stared back and refused to comply. The officers twice repeated the order and, with Baldwin still non-compliant, drew their weapons. As Donnelly approached the Impala's passenger side to determine whether any one else was inside, the car sped off.

In the chase that ensued, Baldwin broke an untold number of traffic laws and narrowly averted multiple serious accidents. As Baldwin attempted to negotiate a right turn at the bottom of an exit ramp, his car jumped the curb and slammed into an embankment. At that point, a black man wearing a white t-shirt opened the passenger door and fled on foot; he was never apprehended. Baldwin ran back onto the highway and jumped off an overpass, but was eventually stopped by other officers who had joined the pursuit. Baldwin was handcuffed and taken via patrol car to Plowman and Donnelly, who identified him as the driver of the Impala.

A search of Baldwin's person incident to his arrest yielded a black mask, a wallet containing a Virginia

driver's license in his name, and a note which read, "Hi-Point Mansfield-Ohio, Model C, 9MM, 9MM Ammunition too." One of the arresting officers recognized Baldwin as a member of the Island Brothers gang, known to infest Quinnipiac Terrace.

A large machine pistol (later determined to have a round in the chamber) was lying on the front passenger floor of the Impala. A search of the car's interior yielded ammunition and a speed loader for the pistol; a Savage 20 gauge pump-action shotgun; and a Hi-point 9MM semiautomatic handgun matching the description in the note found in Baldwin's wallet. The search also yielded drug paraphernalia: small plastic bags of crack cocaine, a balance scale, a digital scale, and a cutting agent. The Impala was registered to Baldwin.

Baldwin was indicted on three counts: (1) being a felon in possession of a firearm (18 U.S.C. § 922(g)(1)); (2) possession with intent to distribute five grams or more of cocaine base (21 U.S.C. § 841(a)(1), (b)(1)(B)); and (3) using and possessing a firearm during, in relation to, and in furtherance of a drug trafficking crime (18 U.S.C. § 924(c)(1)). Baldwin moved to suppress the evidence

recovered from his person and his vehicle on the ground that officers Plowman and Donnelly lacked reasonable suspicion when they initially ordered him to stop.  The government responded that, by speeding away, Baldwin had disobeyed that order and therefore had not been seized.  Alternatively, the government argued that the order to stop was supported by reasonable suspicion.[1]

The district court denied Baldwin's motion on April 7, 2006, reasoning that

> [r]egardless of what Baldwin's initial motivations were in pulling over his car, he never submitted to the officers' show of authority and therefore was never seized. . . .
>
> . . . Baldwin's pre-seizure behavior--including fleeing from police, the operation of his vehicle, crashing his vehicle and running away on foot-- generated reasonable suspicion for his ultimate apprehension.

United States v. Baldwin, No. 05 Cr. 291, 2006 WL 923721, *3-*4 (D. Conn. Apr. 7, 2006).  The district court thus had no occasion to decide whether the initial order to stop was lawful.

Baldwin entered a conditional plea of guilty to the second and third counts of the indictment, reserving the

_____

[1] On this appeal, the government takes no position on the lawfulness of the initial order to stop.

right to appeal the district court's denial of the motion to suppress. He was sentenced principally to 120 months' imprisonment on the second count and 60 months on the third, the sentences to run consecutively.

This appeal is taken only from the denial of the motion to suppress. Where, as here, the district court's ruling "turned on the legal question of when [the defendant] was seized, we review the decision de novo." United States v. Swindle, 407 F.3d 562, 566 (2d Cir. 2005).

**II**

Baldwin argues that he was seized as soon as he pulled to a stop in response to the patrol car's overhead lights and siren, that this seizure was unlawful when made, and that his subsequent flight did not render the seizure lawful retroactively.

The government argues that Baldwin's position has already been rejected by the Supreme Court in California v. Hodari D., which held that a seizure requires "either physical force . . . or, where that is absent, submission to the assertion of authority." 499 U.S. 621, 626 (1991). We have understood the import of Hodari D. to be that "an order

to stop must be obeyed or enforced physically to constitute a seizure." Swindle, 407 F.3d at 572. Baldwin agrees that Hodari D. and Swindle control, but argues that he obeyed the order to stop when he stopped, albeit temporarily.

We hold that, to comply with an order to stop--and thus to become seized--a suspect must do more than halt temporarily; he must submit to police authority, for "there is no seizure without actual submission," Brendlin v. California, 127 S. Ct. 2400, 2405 (2007). Several circuits have said as much. See United States v. Washington, 12 F.3d 1128, 1132 (D.C. Cir. 1994) ("[Defendant] initially stopped, but he drove off quickly before Officer Hemphill even reached the car. Because [defendant] did not submit to Hemphill's order, he was not seized . . . ."); see also United States v. Valentine, 232 F.3d 350, 359 (3d Cir. 2000) ("Even if Valentine paused for a few moments and gave his name, he did not submit in any realistic sense to the officers' show of authority, and therefore there was no seizure until Officer Woodard grabbed him."); United States v. Hernandez, 27 F.3d 1403, 1407 (9th Cir. 1994) ("Hernandez requests we find he submitted to authority and was seized, despite his subsequent flight, merely because he hesitated

8

for a moment and made direct eye contact with Sadar.  We decline to hold these actions sufficient to constitute submission to authority.").  Arguably to the contrary is United States v. Morgan, 936 F.2d 1561, 1567 (10th Cir. 1991) ("[S]ince Officer Eubanks had followed the car in which Defendant was a passenger for several blocks with his red lights flashing; since Officer Eubanks exited from a marked police car, in uniform, and asked the Defendant to hold up; and since Defendant, at least momentarily, yielded to the Officer's apparent show of authority, we find Mr. Morgan was seized for purposes of the Fourth Amendment . . . ."), but for the reasons that follow, we decline to adopt the reasoning of Morgan.

Whether conduct constitutes submission to police authority will depend, as does much of the Fourth Amendment analysis, on "the totality of the circumstances--the whole picture."  United States v. Cortez, 449 U.S. 411, 417 (1981); see also Brendlin, 127 S. Ct. at 2409 ("[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run

away."). Baldwin's conduct, all circumstances considered, amounted to evasion of police authority, not submission. Cf. Hernandez, 27 F.3d at 1407 ("We decline to adopt a rule whereby momentary hesitation and direct eye contact prior to flight constitute submission to a show of authority."); United States v. Lender, 985 F.2d 151, 155 (4th Cir. 1993) ("Defendant asks us to characterize as capitulation conduct that is fully consistent with preparation to whirl and shoot the officers.").

Baldwin argues that he was seized at the moment he pulled over because "a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). But this objective requirement "states a necessary, but not a sufficient, condition for seizure," Hodari D., 499 U.S. at 628; see also United States v. Sealey, 30 F.3d 7, 10 (1st Cir. 1994). A reasonable person standing in Baldwin's place would have felt bound to stop, and having stopped and stayed, would be able to argue suppression on the ground of a baseless seizure. See Swindle, 407 F.3d at 572 ("Merely feeling restrained is not enough . . . ."); Washington, 12 F.3d at 1132 ("Although a reasonable person would not have believed

10

that she was free to continue driving once Officer Hemphill activated his sirens and ordered the Mazda's driver to stop, [defendant] did not in fact submit to the officer's order.").[2]

Our ruling is not predicated on the brevity of Baldwin's stop, but on the fact that the stop itself did not constitute submission.  In other words, it is the nature of the interaction, and not its length, that matters.  See Delaware v. Prouse, 440 U.S. 648, 655 (1979) ("[S]topping an automobile and detaining its occupants constitute a 'seizure' . . . even though the purpose of the stop is limited and the resulting detention quite brief.").  Because Baldwin's momentary stop did not constitute submission to police authority, he had not been seized within the meaning of the Fourth Amendment.

---

[2] Baldwin cites United States v. Coggins for the proposition that flight after seizure does not preclude a finding of seizure.  See 986 F.2d 651, 654 (3d Cir. 1993) ("Even though he fled soon thereafter, the combination of Coggins' expressed desire to leave, Agent Inouye's order that he stay, and Coggins' yielding to police authority resulted in a seizure for purposes of the Fourth Amendment").  Because we conclude that Baldwin had not been seized by the time he fled, we have no occasion to decide whether or to what extent the reasoning of Coggins would apply.

11

**III**

We are left to determine the validity of the seizure of evidence from Baldwin's car and person at the end of the car chase.

The district court concluded that "Baldwin's pre-seizure behavior--including fleeing from police, the operation of his vehicle, crashing his vehicle and running away on foot--generated reasonable suspicion for his ultimate apprehension." Baldwin, 2006 WL 923721, *4. We frame the issue differently: because Baldwin's ultimate seizure was an arrest,[3] the question is one of probable cause. See Maryland v. Pringle, 540 U.S. 366, 370 (2003) ("A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause."). For the reasons articulated by the district court, we conclude that the arrest was supported by probable cause and that the evidence

---

[3] The government's brief says that the search of Baldwin was done "incident to arrest," thereby conceding that his seizure constituted an arrest and required probable cause.

resulting therefrom was properly admitted.[4]

Baldwin argues, however, that his seizure cannot be justified by events that unfolded after an order to stop that, as he contends and as the government implicitly concedes for present purposes, was not based on reasonable suspicion, let alone probable cause. Baldwin relies chiefly on United States v. Swindle, which observed in dicta that "if subsequent incriminating events cannot justify an unreasonable stop, then it logically follows that subsequent incriminating events should not be able to justify an unreasonable order to stop." 407 F.3d at 568. However, the holding of Swindle was that Supreme Court precedent has "implicitly authorized a defendant's seizure based on events occurring after issuance of an unreasonable order to stop." Id. We have since reaffirmed our adherence to this implicit rule:

> An individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business, and his refusal to cooperate may not form the basis for his detention. See Florida v. Royer, 460 U.S. 491, 498 (1983). "But unprovoked flight is simply not

---

[4] At oral argument, the government argued for the first time that the search of Baldwin's car was justified on the theory of abandonment. Because we conclude that the police had probable cause to arrest Baldwin, we need not consider this alternative basis for the search of his car.

13

> a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 125 (2000).

<u>United States v. Muhammad</u>, 463 F.3d 115, 123 (2d Cir. 2006).

We acknowledge that this rule could create an incentive for the police to issue unreasonable orders to stop in the hopes of creating reasonable suspicion or probable cause. But as the Supreme Court has pointed out,

> [u]nlawful orders will not be deterred . . . by sanctioning through the exclusionary rule those of them that are <u>not</u> obeyed. Since policemen do not command "Stop!" expecting to be ignored, or give chase hoping to be outrun, it fully suffices to apply the deterrent to their genuine, successful seizures.

<u>Hodari D.</u>, 499 U.S. at 627.

\* \* \*

For the foregoing reasons, the judgment of the district court is affirmed.

14