The FUND FOR ANIMALS, Green Mountain Animal Defenders, Inc., Sherry Pyden, Bert Dodson and Bonnie Dodson, Plaintiffs–Appellants,

v.

Bruce BABBITT, Secretary of U.S. Department of Interior, Mollie Beattie, Director, U.S. Fish and Wildlife Service, Allen Elser, Commissioner, Vermont Department of Fish and Wildlife, Defendants–Appellees.

Nos. 957, Docket 95–6167.

United States Court of Appeals, Second Circuit.

Argued Jan. 24, 1996.

Decided July 17, 1996.

Eric R. Glitzenstein, Washington, D.C. (Kimberley K. Walley, Meyer & Glitzenstein, Washington, D.C., of counsel), for Plaintiffs–Appellants.

Helen M. Toor, Assistant United States Attorney, Chief, Civil Division, Burlington, VT (Charles R. Tetzlaff, United States Attorney, District of Vermont, Burlington, VT, of counsel), for Defendants–Appellees Bruce Babbitt and Mollie Beattie.

John H. Hasen, Assistant Attorney General, Montpelier, VT (Jeffrey L. Amestoy, Attorney General of the State of Vermont, Montpelier, VT, of counsel), for Defendant–Appellee Allen Elser.

Before: JACOBS, LEVAL and PARKER, Circuit Judges.

PARKER, Circuit Judge:

In 1992, as part of a Moose Management Program, the State of Vermont decided to hold its first moose hunt since 1896. Vermont obtained funding from the federal Fish and Wildlife Service for a "Moose Investigation Project" in 1993. Among other things, this project included preparation for the hunt. Plaintiffs, the Fund for Animals, Green Mountain Animal Defenders, Inc., Sherry Pyden, Bert Dodson, and Bonnie Dodson brought suit challenging the federal government's failure to evaluate the environmental consequences of the Moose Investigation Project before providing funding. The United States District Court for the District of Vermont (Franklin S. Billings, *Judge*) granted defendants' motion for summary judgment on the ground that the case had become moot when the federal government limited its funding to certain narrow portions of the project. Plaintiffs appeal from this judgment.

We reverse, and remand the case to the district court for further proceedings. The federal government did not discontinue funding on all portions of the Moose Investigation Project that plaintiffs contend trigger the NEPA review requirement. As a result, the government's limiting action did not moot plaintiffs' case.

## I. BACKGROUND

To understand the facts of this case, one must be familiar with the framework of several federal environmental statutes, and with the history of the moose hunt in Vermont.

### A. *The Statutory Framework*

Under the Federal Aid in Wildlife Restoration Act, 16 U.S.C. §§ 669–669i ("WRA"), the federal government provides funding to states for, *inter alia,* "research into problems of wildlife management as may be necessary to efficient administration affecting wildlife resources." 16 U.S.C. § 669a. The Depart-

130

ment of the Interior ("DOI"), acting through the United States Fish and Wildlife Service ("FWS"), allocates WRA funds. *See* 16 U.S.C. § 669. To obtain project funding under the Act, a state must submit an Application for Federal Assistance which includes an application form, a grant proposal, and a "Program Narrative." The Program Narrative is a 5–year detailed plan explaining the work to be performed and the estimated costs. *See generally* 16 U.S.C. § 669e. If funding is approved, the state first spends its own money on the project, and then submits invoices to receive reimbursement from the federal government. 16 U.S.C. § 669b.

A state must fulfill an additional requirement in order to receive WRA funds—it must submit evidence that the proposed project complies with all applicable federal laws, including the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"). NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. Its purpose is to "help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id.* at 1500.1(c). Under NEPA, federal agencies must prepare an Environmental Impact Statement ("EIS") assessing the beneficial and adverse environmental impacts of any proposed major federal action that significantly affects the quality of the human environment. *See* 42 U.S.C. § 4332(2)(C). NEPA is implemented by the Council on Environmental Quality ("CEQ"), which has promulgated regulations governing agencies' compliance with the statute. *See* 42 U.S.C. §§ 4341–4347.

According to CEQ regulations, federal agencies often must prepare an Environmental Assessment ("EA") when determining whether a project is one that will significantly affect the environment and require an EIS. 40 C.F.R. §§ 1501.4 & 1508.9. If, after preparing an EA, the agency decides that an EIS is not needed, it must also prepare a Finding of No Significant Impact ("FONSI") which explains why the action "will not have a significant effect on the human environment and for which an [EIS] therefore will

not be prepared." 40 C.F.R. § 1508.13. However, an agency is not required to prepare an EIS or an EA for "categorical exclusions," categories of actions that an agency has predetermined will have no significant environmental impact. The CEQ has authorized the use of categorical exclusions to promote efficiency in the NEPA review process. *See* 40 C.F.R. 1508.4. FWS and DOI have issued regulations applying categorical exclusions to such matters as non-destructive data collection, inventory study, research, monitoring, public safety, and education. *See Department of the Interior Departmental Manual,* 516 DM 2, App. 1 (1984) & 516 DM 6 App. 1 (1982). Categorical exclusions may never be invoked if the action at issue may "[h]ave highly controversial environmental effects", "[h]ave highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks," or are "directly related to other actions, with individually insignificant but cumulatively significant environmental effects." 516 DM 2 at App. 2.

B. *The Moose Hunt in Vermont*

Moose hunting was first banned in Vermont in 1896, after a combination of hunting and loss of habitat almost wiped out the once plentiful moose population. In December 1992, scientists estimated that there were about 1500 moose in Vermont. *Vermont Fish & Wildlife Dep't Program Narrative* (June 15, 1993).

The State of Vermont published a "Moose Management Plan" in 1992 after conducting a study on the state's moose population. The study concluded that the Vermont moose population could sustain an annual hunt in Essex County. The plan sought to "monitor moose population levels" by instituting a study of the number of moose and the health of moose in Vermont, and to "minimize negative interactions between humans and moose," by, among other things, educating Vermont drivers to avoid moose collisions.

On June 21, 1993, the state submitted an application to the FWS seeking federal funding under the Wildlife Restoration Act to assist with the state's "Moose Investigations Project." The project included six jobs relat-

ed to the study and hunting of moose in Vermont, to be conducted over five years. The jobs were as follows:

1) Administration of a Legal Moose Harvest
2) Collection, Tabulation and Analysis of the Legal Moose Harvest
3) Collection, Tabulation, and Analysis of Moose Mortality from Causes other than Legal Hunting
4) Collection, Tabulation and Analysis of Moose Sighting Reports
5) Moose Population Monitoring
6) Moose/Human Conflicts

Job number one, Administration of the Legal Moose Harvest, is the focus of plaintiffs' lawsuit. Job number one's description in the Program Narrative described five elements of the administration of the legal moose hunt:

1) Conduct periodic public information-gathering meetings ... to measure public desires and compatibility of current moose density.
2) Using population modeling techniques outlined in Job 5, prepare any recommended harvest regulation necessary to provide benefits and moose densities, within prescribed limits, desired by local publics.
3) Prepare and distribute moose hunting application forms and associated materials.
4) Process applications received, conduct random lottery drawing of permittees, and notify successful applicants.
5) Develop a mandatory hunter training workshop and conduct two such prehunt workshops annually, one in August for residents and one in October for replacements and non-residents.

Along with the Application for Federal Assistance, the Vermont Department of Fish and Wildlife (DFW) submitted a form stating that the entire Moose Investigation Project was categorically exempted from NEPA review. On August 23, 1993, the FWS issued a two-sentence form, signed by John Organ, Northeast Wildlife Program Chief for Federal Aid at FWS, concurring with DFW's categorical exclusion claim. Neither form provided any support for the position that the program was categorically excluded from NEPA, or mentioned which categorical exclusion was being invoked.

Vermont's first moose hunt conducted under the Moose Investigation Project took place from October 19–21, 1993.

The FWS formally approved Vermont's Application for Federal Assistance for the project in February 1994, four months after the first moose hunt had taken place. Consistent with its funding procedure under the WRA, FWS reimbursed Vermont for 75% of the costs that the state had incurred while administering the project. *See* 16 U.S.C. § 669e(a)(1). These funds were applied to all elements of the project, including all five elements of the "Administration of the Legal Moose Harvest" described above.

According to his affidavit, Organ realized sometime in 1994 that two of the five elements of the moose harvesting project had been erroneously approved. According to his interpretation of FWS policy, activities directly related to the issuance of hunting licenses and permits, such as items (3) and (4) of the harvesting project, are ineligible for WRA funds. The Vermont DFW and Organ agreed later that year to remove items (3) and (4) from the program. The State of Vermont returned the portion of the funds spent on these activities.

On June 21, 1994, Vermont submitted its 1994–95 Project Agreement to the FWS. Requests for funding of the permit and application related activities had been removed. On August 19, 1994, after reviewing the revised Program Narrative, the FWS reiterated its finding that the Moose Investigations Project was categorically excluded from NEPA review. The FWS again failed to identify the specific categorical exclusion it was invoking.

The 1994 moose hunt was held from October 17–19, 1994. On October 17, the first day of the hunt, plaintiffs filed this lawsuit claiming that defendants' failure to prepare either an EA or an EIS was in violation of their federal duties under NEPA. The complaint named as defendants Bruce Babbitt, Secretary of the Department of the Interior, Mollie Beattie, Director of the U.S. Fish and

Wildlife Service, and Allen Elser, Commissioner of the Vermont Department of Fish and Wildlife Service. Plaintiffs claimed that by funding the project, FWS had established a partnership between Vermont and the federal government that subjected both entities to the requirements of NEPA. Consequently, plaintiffs argued, the court should enjoin either the moose hunt or the federal funding until the defendants comply with NEPA.

## C. *The Proceedings Below*

The district court dismissed plaintiffs' claim as moot. It reasoned that, when applied to injunctive relief, "the mootness doctrine generally requires dismissal when the activities sought to be enjoined have already occurred and can no longer be prevented." Focusing on the fact that the FWS had corrected its erroneous approval of federal funding of the licensing and permit activities described in elements of (3) and (4) of the Program Narrative, the court determined that the case was moot because:

> the only activities which would arguably subject the moose hunt to NEPA are the federal funding of the permitting and application procedures described in elements (3) and (4) of the 1993–94 program narrative.... [A]t the time that Plaintiffs brought this suit, the FWS had already dis[bu]rsed the 1993–94 funds to the DFW, and the DFW had already used the funds to help defray the costs of administering the hunt. Thus, Plaintiffs' legal remedy under NEPA was no longer available: they could not enjoin the federal action while its environmental consequences were considered, because the federal action (allegedly providing federal funds for a state project without complying with NEPA) had already and irreversibly taken place. Since there is no legal remedy available to Plaintiffs under NEPA, the Court concludes that this case should be dismissed as moot.

In other words, the district court found that the problematic elements of the Moose Investigation Program had ceased to receive federal funding. Because "there are no allegations that NEPA will be violated in the future", plaintiffs' complaint was dismissed as moot.

On appeal, plaintiffs ask this court to reverse the district court's ruling and to remand the case for further proceedings. The defendants ask us to affirm the district court's mootness ruling; in the alternative, they ask us to dismiss the case on the ground that plaintiffs lack standing, or on the ground that the defendants are entitled to summary judgment on the merits. We reverse the district court's finding of mootness, and decline to rule on the standing issue or the merits.

## II. DISCUSSION

### A. *Standard of Review*

As this appeal is from the district court's grant of summary judgment, the standard of review is *de novo*. *New York Dep't of Social Servs. v. Shalala*, 21 F.3d 485, 491 (2d Cir.1994). Likewise, we review questions of mootness and standing *de novo* because they are questions of law. *Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir.1994). However, judicial review of agency action is governed by the Administrative Procedures Act, 5 U.S.C. § 706. Therefore, if this court is to reach the merits of the underlying agency action, it should reverse only if the action was "not supported by substantial evidence," or was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Mr. Sprout, Inc. v. United States*, 8 F.3d 118, 123 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2674, 129 L.Ed.2d 809 (1994).

### B. *Mootness*

"It is commonplace that the jurisdiction of federal courts is limited to cases and controversies." *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir.1993); U.S. Const. art. III, § 2, cl. 1. As a result, litigants must demonstrate a "personal stake" or "legally cognizable interest in the outcome" of their case. *Cook*, 992 F.2d at 19 (citations omitted). "While the standing doctrine evaluates this personal stake at the outset of the litigation, the mootness doctrine ensures that the litigant's interest in the outcome continues to

exist throughout the life of the lawsuit." *Id.* A case or controversy becomes moot either when the injury is healed and only prospective relief has been sought, or when it becomes impossible for the courts to redress the injury through the exercise of their remedial powers. *Alexander v. Yale Univ.*, 631 F.2d 178, 183 (2d Cir.1980).

We disagree with the district court's finding of mootness in this case. After noting that "the only activities that would arguably subject the moose hunt to NEPA are ... elements (3) and (4)," (which were no longer being federally funded), the court concluded that plaintiffs' complaint did not allege that future funding of the Moose Investigation Project would be carried out in violation of NEPA. Thus, it dismissed the claim as moot.

Plaintiffs did not allege that only elements (3) and (4) of the Moose Harvest Program called for NEPA review. In challenging defendants' failure to prepare an EA or an EIS before funding Vermont's Moose Investigation Project, the complaint specifically mentioned the three elements of the program that continue to receive federal funding. *See Plaintiffs' Amended Complaint* at 14 ("Administration of the Moose hunt includes: (1) periodic public information-gathering meetings in selected Wildlife Management Units ("WMUs"); (2) preparing recommended moose hunt regulations; (3) developing a mandatory hunter training workshop and conducting two pre-hunt workshops annually."). Thus, the district court's finding of mootness must have rested on its conclusion that the other three elements of the Moose Harvest Program are categorically excluded from NEPA's review requirements as a matter of law.

■ We disagree. As it pertains to these three elements, the court's finding of mootness was inappropriate. As to element 2, the continued federal funding of recommendations for "harvest regulation" affecting "moose densities" reflects an unambiguous involvement by the federal government in the design, magnitude, and conduct of a moose hunt. This activity does not seem to fit comfortably within the categorical exclusions. It is not clear that it constitutes "non-destructive data collection, inventory ...,

study, research and monitoring" or "[p]ersonnel training, environmental interpretation, [a] public safety effort[ ], [or] other educational activit[y]," as asserted by the FWS. *Department of the Interior Departmental Manual*, 516 DM 2, App. 1 (1984) & 516 DM 6, App. 1 (1982). Even if it did fit within the presumptive categorical exclusions, the exclusion would likely be overridden by the "highly controversial environmental effects" of the financed activity, which is, after all, moose hunting. *Department of the Interior Departmental Manual*, 516 DM 2, App. 2. (1984).

As to element 5, at oral argument plaintiffs said that the federally funded hunter training workshop instructs moose hunters in firearm selection and shot placement. Defense counsel did not know if this statement was accurate, but the plaintiffs' assertion is consistent with and suggested by the language of element 5. Regardless whether plaintiffs are correct about these details, so long as the workshop is devoted to training in moose hunting, the issue again arises whether its controversial environmental impact trumps the presumptive exclusion for "education." We recognize that a contrary argument may be made if the workshops are limited to such subjects as safety.

Finally, plaintiffs contend that federal funding of portions of the Moose Investigation Project makes the entire undertaking a "major federal action" for the purposes of NEPA. *Compare Scottsdale Mall v. State of Indiana*, 549 F.2d 484, 488–89 (7th Cir.1977), *cert. denied*, 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978); *with National Organization for the Reform of Marijuana Laws v. United States Drug Enforcement Administration*, 545 F.Supp. 981, 984 (D.D.C.1982). While it is not clear that this argument should ultimately prevail, its potential application to this case contributes to our conclusion that the district court's finding of mootness was premature.

The judgment of the district court is vacated.

## C. *Standing*

■ Defendants ask us to affirm the district court's judgment on an alternative

ground; that plaintiffs lack standing to challenge the government's failure to conduct NEPA review of the moose project. As pointed out by the defendants, courts of appeals are free to affirm district court decisions on any grounds for which there is a record sufficient to permit conclusions of law. *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987).

■ In order to meet the "case or controversy" requirement of Article III of the Constitution, a plaintiff must establish that he has standing. The constitutional minimum of standing contains three elements. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). These are (1) that the plaintiff suffered personal injury or threat of injury; (2) that the injury fairly can be traced to the action challenged ("causation"); and (3) that the injury is likely to be redressed by the requested relief ("redressibility"). *Id.* at 560–61, 112 S.Ct. at 2136.

Plaintiffs allege that they have suffered two distinct types of injury as a result of FWS's decision to fund the Moose Investigation Project in the absence of NEPA review. First, they claim that their professional, recreational, aesthetic, and informational interests are threatened by the moose hunt. Second, they claim that they have been deprived of an opportunity to comment on the federal agencies' decision to fund Vermont's hunt, and to receive information regarding the hunt's environmental impacts. Defendants do not argue that these injuries are insufficient to satisfy the first prong of standing. Instead, they claim that plaintiffs have failed to demonstrate causation or redressibility.

■ To satisfy the causation and redressibility requirements, plaintiffs must show that their injuries are fairly traceable to FWS's failure to conduct NEPA review of its funding of the Moose Investigation Project, and that these injuries are likely to be ameliorated by a judicial ruling directing the agency to prepare an EA or an EIS. *See Competitive Enter. Inst. v. National Highway Traffic Safety Admin.,* 901 F.2d 107, 113 (D.C.Cir.

1990). According to defendants, plaintiffs have failed to point to evidence indicating that their injuries are caused by the federal funding of the Moose Investigations Project, because federal funds are not being used to directly fund the moose hunt. Defendants also stress that Vermont would continue to hold the annual hunt absent federal funding. Plaintiffs argue that they satisfy the causation and redressibility requirements, as they are asking the court to enjoin the moose hunt pending NEPA review. Furthermore, they challenge defendants' characterization of the federal funding as "limited," and question the credibility of Vermont's assertion that the hunt would continue without federal dollars.

We decline to rule on standing at this time, and remand the issue to the district court. This complicated issue was neither ruled on by the district court nor fully briefed by the parties. Based on the record before us, it is unclear whether, at this stage, plaintiffs have articulated facts sufficient to withstand defendants' challenge to their standing. *See Lujan v. Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2137 (noting that, in response to a summary judgment motion arguing that they lack standing, plaintiffs "no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts ... which for purpose of the summary judgment motion will be taken to be true." (internal quotations omitted)). The injuries articulated by plaintiffs in this case (such as the reduced opportunity to observe moose, and the right to comment on the federal agencies' decision to fund a moose hunt) all presume that the FWA is actually funding Vermont's moose hunt, or that the hunt will cease absent federal funding. Defendants insist that federal funds are being used, not to hunt moose, but to study them. If plaintiffs can point to evidence indicating that the federal funds are actually being used towards the moose hunt,[1] or that federal funding of portions of the Moose Investigation Project "so imbued the [moose hunt] with a federal character that ... compliance with federal environmental statutes was necessary,"

---

1. If plaintiffs can point to evidence suggesting that the government is instructing hunters in firearm placement and shot selection, for exam-

ple (*see supra* part IIB), they might successfully argue that the federal government is in effect contributing funding to the moose hunt itself.

*Scottsdale Mall,* 549 F.2d at 489, they may demonstrate standing to pursue this claim on its merits. This issue has not been fully briefed to this court, and plaintiffs claim that they are entitled to further discovery before a decision is made.[2] We remand to the district court for consideration of the standing issue, and, if appropriate, of the merits of plaintiffs' case.

## III. CONCLUSION

The judgment of the district court dismissing plaintiffs' complaint on the grounds of mootness is vacated. The case is remanded to the court for further proceedings consistent with this opinion.

2. Among the additional discovery sought by plaintiffs is a deposition of John Organ of the Fish and Wildlife Service to test the "many factual representations" made in his affidavit which appear nowhere in the administrative record. We leave it to the district court to determine whether this or other discovery is appropriate at this stage of the litigation.