**Alan M. ADLER, Plaintiff,**

v.

**George PATAKI, Thomas F. Doherty, James Natoli, Michael Finnegan, Dennis C. Vacco, William M. Flynn, Donald P. Berens, Thomas A. Maul, John Doe and Jane Doe, in their official and individual capacities, Defendants.**

**No. 1:96–CV–1950 (FJS/DRH).**

United States District Court, N.D. New York.

May 10, 2002.

Sue H.R. Adler, Esq., Albany, for Plaintiff.

Hoguet Newman & Regal, LLP, New York, Attorneys for Defendants Pataki, Doherty, Natoli, Finnegan, and Maul, Frederic S. Newman, Esq., Melissa Weiss, Esq., of counsel.

Snitow Kanfer Hotzer & Millus, LLP, New York, Attorneys for Defendants Vacco and Flynn, Franklyn H. Snitow, Esq., Richard Braunstein, Esq., of Counsel.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, Chief Judge.

## I. INTRODUCTION

Presently before the Court are Plaintiff's motion for summary judgment, the cross-motion for summary judgment of Defendants Pataki, Doherty, Natoli, Finnegan and Maul (collectively the "Executive Department Defendants") and the cross-motion for summary judgment of Defendants Vacco and Flynn (collectively the "Law Department Defendants"). The Court heard oral argument in support of, and in opposition to, these motions on March 20, 2002, and reserved decision at that time. The following constitutes the Court's determination of the pending motions.

## II. BACKGROUND

Plaintiff filed his complaint in December 1996, asserting eight separate causes of action: (1) a claim for First Amendment retaliation, pursuant to § 1983, alleging that Defendants terminated his employment based upon his political affiliation; (2) a claim for First Amendment retaliation, pursuant to § 1983, alleging that Defendants terminated his employment because of his wife's lawsuit against the State; (3) a § 1983 conspiracy claim for First Amendment retaliation; (4) a § 1985 conspiracy claim; (5) a state claim for intentional infliction of emotional distress; (6) a state claim based upon a violation of Article 1, §§ 8–9 of the New York State

Constitution; (7) a claim brought pursuant to Article 78 of the New York Civil Practice Law and Rules, alleging that Defendants' actions were arbitrary and capricious; and (8) a claim alleging a violation of New York Mental Hygiene Law § 13.19.

Plaintiff's claims arise from his termination from his position of Deputy Counsel for Litigation for the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD"). He was one of three Associate Counsels serving directly under the General Counsel of OMRDD. The position of Deputy Counsel is classified as exempt by the State from civil service protection, granting the appointing authority broad discretion in the appointment and removal process. In addition, the State has classified Plaintiff's position as "policy making" in accordance with New York Public Officers Law.

Plaintiff held his position as Deputy Counsel since his appointment in 1981. It is undisputed that Plaintiff's work performance during all relevant times was satisfactory or better. In December 1995, Plaintiff's wife, Susan H.R. Adler, commenced a lawsuit against then State Attorney General Dennis Vacco as a result of her termination as a State Assistant Attorney General. Ms. Adler's litigation was pending during the time period relevant to this lawsuit.

On December 6, 1996, Plaintiff's supervisor, General Counsel Paul Kietzman, informed Plaintiff that he was being terminated. In his complaint, Plaintiff alleged that Defendants terminated him because he did not share the same political philosophy as Governor Pataki and because his wife had commenced a lawsuit against the State Attorney General.

Early in this litigation, Plaintiff moved for a preliminary injunction seeking reinstatement to his position as Deputy Counsel. In an oral decision, issued on January 23, 1997, the Court denied Plaintiff's mo-

tion, finding that he had not demonstrated that he was likely to succeed on the merits.

Thereafter, Defendants moved for summary judgment, arguing that Plaintiff had failed to demonstrate a material issue of fact as to any of his federal claims or, in the alternative, that Defendants, in their individual capacities, were entitled to qualified immunity. Defendants further moved for dismissal of Plaintiff's state law claims pursuant to the Eleventh Amendment of the United States Constitution or pursuant to this Court's discretion to decline to exercise supplemental jurisdiction over those claims.

The Court granted Defendants' motion, finding that Plaintiff's position was exempt from First Amendment protection for dismissal based upon political affiliation alone. *See Adler v. Pataki*, No. 96–CV–1950, 1998 WL 326748, *3 (N.D.N.Y. June 19, 1998). The Court also found that "even if the Defendant's termination of the Plaintiff was based on his political affiliation *and* his wife's exercise of her First Amendment right to bring a suit against the State, the Plaintiff has still failed to state a claim for First Amendment retaliation." *Id.* (footnote omitted). The Court also noted that even if the only reason for Plaintiff's termination was his wife's lawsuit, "the individual Defendants would still be entitled to qualified immunity in their individual capacities based on the holding of *McEvoy*." *Id.* n. 6. Therefore, the Court dismissed all of Plaintiff's federal claims. In addition, because it had dismissed all of Plaintiff's federal claims, the Court declined to exercise its supplemental jurisdiction over his state law claims. *See id.*

Plaintiff appealed. The Second Circuit reversed and remanded, finding that (1) Plaintiff could "proceed with his claim that he was fired solely in retaliation for his wife's lawsuit, and not at all for reasons of political patronage[;]" (2) Plaintiff

"qualifies as a policy-maker, and the defendants will therefore prevail in this action if they can ultimately demonstrate that he was in fact fired solely for reasons of political patronage[;]" and (3) "to the extent that the defendants acted with a mixed motive, i.e., if they fired the plaintiff both in retaliation for his wife's activities and for reasons of political patronage ... the defendants will bear the burden of demonstrating that they would have removed the plaintiff from his position even if his wife had not been involved in litigation against the State." *Adler v. Pataki,* 185 F.3d 35, 38 (2d Cir.1999).

The Second Circuit affirmed the Court's determination that Defendants were entitled to qualified immunity in their individual capacities even if the sole reason for Plaintiff's termination was his wife's lawsuit. *See id.* at 48. Finally, the Second Circuit noted that "[q]ualified immunity shields the defendants only from claims for monetary damages and does not bar actions for declaratory or injunctive relief.... On remand, if [Plaintiff] ultimately succeeds on the merits of his state and federal claims, the District Court may fashion equitable remedies, including reinstatement, based on its assessment of the equities as they are developed at trial." *Id.* at 48. The court went on to note, however, that "the claim for declaratory relief may well be rendered moot if the District Court grants Adler's reinstate-ment claim or other injunctive relief." *Id.* (citation omitted).[1]

With this background in mind, the Court will address each of the issues raised in the parties' motions in turn.

## III. DISCUSSION

### A. Plaintiff's First Amendment retaliatory discharge claim

#### 1. *Eleventh Amendment concerns— official capacity claims*

Generally, "the Eleventh Amendment bars suits of any sort against a state in federal court unless the state has consented to be sued or Congress has expressly abrogated the state's immunity." *Kostok v. Thomas,* 105 F.3d 65, 68 (2d Cir.1997) (footnote omitted). "Claims for damages brought against state employees in their official capacities are likewise construed as claims against the state and fall to the same Eleventh Amendment bar." *Schallop v. N.Y. State Dep't of Law,* 20 F.Supp.2d 384, 390–91 (N.D.N.Y.1998) (citation omitted).[2]

On the other hand, official capacity claims that seek prospective injunctive relief, such as reinstatement, are governed by a different standard. *See Schallop,* 20 F.Supp.2d at 391. Claims that seek such relief are not considered claims against the State. *See id.* (citing *Pennhurst State*

---

**1.** After the Second Circuit's decision, the following claims remain viable: (1) Plaintiff's First Amendment retaliation claim, pursuant to § 1983, alleging that he was terminated in retaliation for his wife's litigation against the State; (2) Plaintiff's § 1983 and § 1985 conspiracy claims, which were not addressed either by this Court or the Second Circuit; and (3) Plaintiff's state law claims.

At oral argument on March 20, 2002, Plaintiff's counsel stated that Plaintiff was no longer pursuing his § 1985 conspiracy claim or his state law claim for intentional infliction of emotional distress. She also stated that Plain-tiff was not seeking summary judgment on his claim under New York Mental Hygiene Law § 13.19 or on his claims under the New York State Constitution, which mirror his federal claims.

**2.** As this Court noted in *Schallop,* claims for money damages against state officials would also be subject to dismissal under § 1983. *See Schallop,* 20 F.Supp.2d at 391 n. 5. "As noted, these claims are viewed as claims against the state itself and a state is not a 'person' subject to suit within the meaning of section 1983." *Id.* (citations omitted).

*Sch. & Hosp. v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)) (footnote omitted). Thus, these claims are not barred by the Eleventh Amendment. *See id.* (citations omitted). This exception, however, "only applies in circumstances where the state official has the authority to perform the required act"—such as the reinstatement of the plaintiff. *See id.*

■ Under this exception, Plaintiff's claims against the Law Department Defendants in their official capacity for injunctive and declaratory relief must fail. First, neither Defendant Vacco nor Defendant Flynn are in a position to reinstate Plaintiff to his former position if the Court were to order such relief. Accordingly, the Court grants the Law Department Defendants' cross-motion for summary judgment with respect to Plaintiff's claim for injunctive relief against them in their official capacity.

■ With respect to the declaratory relief that Plaintiff seeks—a declaration that Plaintiff was highly qualified and competent to perform his job duties, that he was wrongfully terminated and that Defendants' conduct was illegal—the Court finds that this claim must fail because such a declaration would serve no prospective purpose and, thus, it is barred by the Eleventh Amendment. Accordingly, the Court grants the Law Department Defendants' and the Executive Department Defendants' cross-motions for summary judgment with respect to Plaintiff's claim for declaratory relief against them in their official capacity.

### 2. Case and controversy concerns—individual capacity claims

■ It is well-established that " 'the jurisdiction of federal courts is limited to cases and controversies.' " *Fund For Animals v. Babbitt,* 89 F.3d 128, 132 (2d Cir. 1996) (quotation and citation omitted). "A case or controversy becomes moot ...

when it becomes impossible for the courts to redress the injury through the exercise of their remedial powers." *Id.* at 133 (citation omitted). Moreover, declaratory relief is a discretionary remedy, and courts will deny this relief when the declaration sought would not serve a useful purpose in clarifying and settling legal relationships to terminate or afford relief from uncertainty or insecurity. Emotional vindication is not enough to form a basis for awarding declaratory relief. *See Ashcroft v. Mattis,* 431 U.S. 171, 173, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977).

In *Blackburn v. Goodwin,* 608 F.2d 919 (2d Cir.1979), the plaintiffs complained that federal law enforcement agents, including an attorney at the Department of Justice, had violated their constitutional rights through use of illegal wiretaps, entries into their homes and interception of their mail. The plaintiffs sought injunctive and declaratory relief. Although the Second Circuit's decision focused on venue, the court dismissed the claims against the Department of Justice attorney because he had transferred to a different Department of Justice Division and no longer had "the official capacity necessary to enable him to comply with the injunctive relief sought." *Id.* at 925. For the same reason, the court found that "the claim for declaratory relief [against the same defendant] is now moot." *Id.* (footnote omitted); *see also Randolph v. Rodgers,* 253 F.3d 342, 345–46 (8th Cir. 2001) (dismissing claims for prospective injunctive relief based upon disability discrimination as moot with respect to state officials who no longer could execute the particular actions that the plaintiff was requesting).

■ The Law Department Defendants acknowledge that qualified immunity does not shield them from actions for declaratory or injunctive relief. Nonetheless, they assert that Plaintiff's remaining claims

against them fail because there is no current case or controversy between them and Plaintiff. To support this proposition, they rely upon this Court's observation in *Marshall v. Switzer*, 900 F.Supp. 604 (N.D.N.Y.1995), that "[a]ctions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." *Id.* at 615 (citations omitted). The Law Department Defendants argue that because they never had authority to make a decision concerning any employment at OMRDD, let alone the authority to reinstate Plaintiff, there is no case or controversy between them and Plaintiff.

The Court agrees. Even if Plaintiff were to succeed on his claims and the Court were to award him the injunctive relief he seeks, this relief could not be effected by the Law Department Defendants, neither of whom are in a position in which they can afford Plaintiff any relief. Moreover, as noted above, the declaration that Plaintiff seeks would not serve any useful purpose in clarifying the legal relationship between Plaintiff and the Law Department Defendants. Therefore, the Court finds that dismissal of Plaintiff's First Amendment retaliation claim against the Law Department Defendants in their individual capacity is appropriate. Accordingly, the Court grants the Law Department Defendants' cross-motion for summary judgment with respect to Plaintiff's First Amendment retaliation claim.[3]

### 3. Merits [4]

 Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this burden, the burden then shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505 (quotation and footnote omitted); *see* Fed. R.Civ.P. 56(e) ("an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, . . ."). To meet this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). "Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment." *Fincher v. County of Westchester*, 979 F.Supp. 989, 995 (S.D.N.Y.1997) (citing Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991); *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990)). The Court, however, must not weigh the evidence but instead is "required to view the evidence in

---

3. This same rationale provides an alternative basis for granting the Law Department Defendants' motion for summary judgment with respect to Plaintiff's § 1983 conspiracy claim.

4. Since the Court has granted the Law Department Defendants' cross-motion for summary judgment with respect to Plaintiff's First Amendment retaliation claim, the Court need only address the merits of this claim with respect to the Executive Department Defendants.

the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments[.]" *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996) (citations omitted).

To prevail on a claim of First Amendment retaliatory discharge, a plaintiff must demonstrate that the conduct at issue was protected, that the defendants took an adverse action against him, and that there was a causal connection between the protected conduct and the adverse action. *See Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn,* 280 F.3d 98, 106–07 (2d Cir.2001) (quotation and citation omitted). "The causal connection must be sufficient to support the inference that the [protected conduct] played a 'substantial' or 'motivating' part in the employer's adverse employment action." *Crosland v. City of N.Y.,* 140 F.Supp.2d 300, 311 (S.D.N.Y. 2001) (citations omitted). "The lack of knowledge on the part of particular [decision makers] is admissible as some evidence of a lack of a causal connection, ..." *Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000) (citation omitted); *see also Kalb v. Wood,* 38 F.Supp.2d 260 (S.D.N.Y.1999) (summary judgment granted on First Amendment retaliation claim, finding no causal connection between the adverse employment action and the protected conduct and evidence showed that the manager who denied the plaintiff's employment benefits, had no knowledge of lawsuits filed by the plaintiff).

For purposes of this motion, the Executive Department Defendants concede that Plaintiff has satisfied the first two elements of his First Amendment retaliation claim. Therefore, the Court must determine only whether there is a causal connection between Plaintiff's wife's litigation and his termination as Deputy Counsel for OMRDD.

To support his claim that he was fired in retaliation for his wife's litigation and not because of political patronage, Plaintiff relies, among other things, upon the following:

(1) Plaintiff was appointed by a Republican Attorney General with a recommendation from a Republican judge and was replaced by a holdover Democrat who had no political connections to the Pataki Administration, no contact with Pataki's Appointments Office, was solicited for the job by OMRDD General Counsel and was not appointed until more than two months after Plaintiff was fired;

(2) all of the attorneys hired to fill the vacancies in OMRDD's Counsel's Office as a result of the November and December 1996 terminations, except for Plaintiff's replacement, were referred by Pataki's Appointments Office and had political support and/or were involved in Republican politics;

(3) some two dozen holdovers at OMRDD who worked for Governor Cuomo still work for Governor Pataki, including OMRDD Commissioner Maul and General Counsel Kietzman, with more than half a dozen still working in the OMRDD Counsel's office, including those referred for their jobs by Governor Cuomo's Appointments Office;

(4) many people who worked for the Cuomo administration continue to work for Governor Pataki in high-level, sensitive positions;

(5) Defendants were aware of the lawsuit Plaintiff's wife had filed against the Attorney General's office;

(6) Plaintiff's wife's lawsuit was of interest to the Pataki Administration because if the Attorney General's hiring and firing patronage practices were found illegal, the Pataki Administration's ability to dole out patronage jobs to its supporters would have been adversely affected;

(7) on November 8, 1996, the Vacco administration was ordered to pay thousands of dollars in sanctions and turn over tens of thousands of documents without a blanket protective order to Plaintiff's wife in her litigation;

(8) on November 14, 1996, the *Times Union* ran a front-page story and on November 18, 1996, it ran an editorial about possible evidence tampering by the Attorney General's office in Plaintiff's wife's litigation;

(9) on November 27, 1996, at the request of Defendant Doherty, Defendant Natoli called Defendant Maul and told him to fire nine employees including Plaintiff.

Plaintiff also asserts that the temporal proximity between his wife's lawsuit and his termination is compelling evidence of retaliation. In this regard, Plaintiff notes that he was terminated less than one month after his wife was awarded thousands of dollars in sanctions against Defendants Vacco and Flynn, obtained a court order requiring the public disclosure of tens of thousands of documents and the deposition transcripts of Vacco and other defendants, and accused the Attorney General's Office of evidence tampering.

As would be expected, the Executive Department Defendants view the situation differently. They contend that there is no evidence that Plaintiff was discharged in retaliation for his wife's litigation and that there will never be any such evidence because Plaintiff, as well as five other senior executives at OMRDD, were discharged because they held policy-making positions from which they could be discharged at will. Moreover, the Executive Department Defendants assert that the uncontroverted evidence shows that Plaintiff and the others were discharged to make room for Pataki Administration appointees and that, in fact, OMRDD hired six new appointees whom the Pataki Administration

suggested. In support of their argument that Plaintiff and five other senior OMRDD Executives were discharged to make room for Pataki appointees, the Executive Department Defendants rely upon, among other things, the following evidence:

(1) on June 17, 1996, Defendant Doherty received a list of twenty-nine holdovers at OMRDD from Joe Boyd, an administrative consultant, with the cover note, "I am sure the Appointments Office can find some qualified replacements." *See* Weiss Aff., Exh. N. Plaintiff's name was on Boyd's list, as were the names of the five other senior OMRDD executives who were discharged along with Plaintiff during the same two-week period, November 29 to December 9, 1996. *See id.*

(2) in the second half of 1996, Burdick, Senator Bruno's Executive Assistant, provided Defendant Doherty with several lists of holdovers from prior Democratic administrations at a number of New York State agencies, including one for OMRDD. *See* Doherty Tr. at 94–95. This list was prepared by Burdick and his political associates, not by Natoli, Doherty, Maul or any other Defendant. *See* Burdick Tr. at 118–24, 149–58, 186; Doherty Tr. at 94–95. Plaintiff was on Burdick's list. *See* Weiss Aff. at Exhibit O.

(3) in approximately November 1996, Defendant Doherty called Defendant Natoli to discuss replacing holdovers from prior administrations at OMRDD. *See* Doherty Tr. at 106–07. Defendant Natoli, as Director of State Operations, had the decision-making authority for personnel activities at OMRDD and all other state agencies. *See* Natoli Tr. at 51. Defendant Doherty told Defendant Natoli to review the positions at OMRDD and told Defendant Natoli that he would send him a list of positions for his use in that review process. *See* Na-

toli Tr. at 78–80, 91–96; Doherty Tr. at 107–09. Defendant Doherty gave Defendant Natoli Burdick's OMRDD list. *See* Natoli Tr. at 92–93, 96; Burdick Tr. at 149–50, 154–58; Doherty Tr. at 93–95. (4) Defendant Natoli called OMRDD Commissioner Maul on or about November 27, 1996, to inform him that the six OMRDD positions identified on Burdick's OMRDD list needed to be vacated. *See* Natoli Tr. at 97, 113; Maul Tr. at 110–12, 120. Between November 27 and December 9, there were several conversations between Defendant Maul and Defendant Natoli's assistant, Barbara Cohn, concerning the OMRDD positions to be vacated. *See* Maul Tr. at 118–19, 123–38. During these conversations, a total of nine OMRDD positions were discussed. *See* Natoli Tr. at 92–98; Maul Tr. at 115, 120.

(5) As a result of the conversations between Defendant Maul and Defendant Natoli's office, it was agreed that six high-ranking OMRDD executives—including all three OMRDD Associate Counsels, Faulkner, Aveni and Plaintiff—would be discharged immediately from their policy-making positions to create vacancies for Pataki appointees. *See* Natoli Tr. at 109; Maul Tr. at 115–49; Adler Tr. at 101–02.

In further support of their claim that Plaintiff was not terminated because of his wife's litigation, the Executive Department Defendants assert that (1) Plaintiff's supervisor, Kietzman, testified that Plaintiff's wife's litigation did not affect Plaintiff's job performance or Kietzman's perception of Plaintiff as a loyal employee, *see* Kietzman Tr. at 127–29; (2) Defendant Natoli stated that he did not even know that Plaintiff was married to Sue Adler at the time he approved the decision to fire Plaintiff, *see* Natoli Tr. at 122–23; (3) Defendant Maul testified that Plaintiff's wife's litigation was not a factor for him in his decision to fire Plaintiff, *see* Maul Tr.

at 177 (stating that he never discussed Plaintiff's wife's ligation activities with Defendant Natoli or his staff and that he had no reason to believe that Plaintiff's wife's litigation was a motivating factor in the decision to fire Plaintiff); (4) Defendant Natoli's assistant, Barbara Cohn, testified that she had no concerns about Plaintiff's wife's suit against Defendant Vacco, *see* Cohn Tr. at 77–78; and (5) Defendant Doherty testified that Plaintiff's wife's litigation was "absolutely not" a factor in the decision to discharge Plaintiff, *see* Doherty Tr. at 184, and that he was not even aware of the litigation at the time of Plaintiff's discharge, *see* Doherty Tr. at 110 ("The first I heard was when I found out I was being sued in this case.").

Finally, in response to Plaintiff's claim that the appointment of Wolfe, a registered Democrat, to Plaintiff's position demonstrates retaliation, the Executive Department Defendants explain that, within six weeks of the six OMRDD discharges, the Appointments Office began to send OMRDD resumes of individuals supported by the Pataki Administration for OMRDD's consideration. *See* Maul Tr. at 94. All administration candidates were considered and Aveni's position was filled by Robert Mascali. *See* Kietzman Tr. at 63. After considering the Pataki Administration's candidates for Plaintiff's and Faulkner's Associate Counsel positions, Kietzman and Maul decided that the candidates were better suited for Assistant Counsel positions. *See* Kietzman Tr. at 26–31; Maul Tr. at 94–96. To hire those candidates, Kietzman recommended promoting Wolfe and Mary Hester–Gooley, two incumbent Assistant Counsels, and they were promoted to fill the Associate Counsel positions vacated by Plaintiff and Faulkner. *See* Kietzman Tr. at 40–45, 63, 114–15. The Appointments Office approved both promotions and, in fact, Hester–Gooley had been a referral from the Appointments Office. *See* Maul Tr. at

156–59. The positions that Wolfe and Hester–Gooley had held were then filled by Pataki Administration candidates Frank Spada and Patricia Delorey. *See* Kietzman Tr. at 40–45, 63, 114–15. Kietzman also testified that he believed that promoting Wolfe and Hester–Gooley would bolster morale in the Counsel's office, which had just lost all three Associate Counsels, and he convinced Defendant Maul to permit the promotions. *See* Kietzman Tr. at 26–30, 40–45; Maul Tr. at 94–101, 156–58. Thus, according to the Executive Department Defendants, Wolfe's promotion not only does not prove that Plaintiff was fired because of his wife's litigation but to the contrary it establishes that Plaintiff was fired to make room for a Pataki Administration candidate because by promoting Wolfe OMRDD was able to insure that six Pataki Administration candidates could be appointed.

The above are only a few examples of the evidence in the record upon which Plaintiff and the Executive Department Defendants rely to support their respective positions with regard to Plaintiff's First Amendment retaliation claim. These few examples clearly establish that there are genuine issues of material fact that exist with respect to the reason for Plaintiff's termination. Therefore, summary judgment is inappropriate. Accordingly, the Court denies Plaintiff's motion and the Executive Department Defendants' cross-motion for summary judgment with respect to Plaintiff's First Amendment retaliation claim.

**B. Plaintiff's § 1983 conspiracy claim**

To prove a conspiracy to violate § 1983, a plaintiff must demonstrate "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Cul-bertson*, 200 F.3d 65, 72 (2d Cir.1999) (citations omitted). Although " 'conclusory allegations' of a § 1983 conspiracy are insufficient, ..., 'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence.' " *Id.* (internal quotation and other quotation omitted).

Defendants assert that Plaintiff's § 1983 conspiracy claim against them fails because there is no evidence of an agreement, concerted activity, or an overt act. According to them, Plaintiff's conspiracy claim is based entirely upon a meeting that Plaintiff had with his supervisor, Kietzman, in March 1996, nine months before his dismissal ("the May incident"). That meeting resulted from a statement that Plaintiff's wife made to an Assistant Attorney General, which raised the concern that Plaintiff might disclose OMRDD confidential information to his wife. The undisputed evidence shows that Plaintiff assured Kietzman and Berens, orally and in writing, that he would not divulge OMRDD confidential information to his wife and that he continued to serve as OMRDD Deputy Counsel without incident until his dismissal.

Although Plaintiff contends that there is overwhelming circumstantial evidence of retaliation, he does not explain how this circumstantial evidence, even if accepted, results in a finding that Defendants engaged in a conspiracy to terminate his employment. To support this claim, Plaintiff relies upon two "facts," which he contends evidence a conspiracy. First is the fact, according to Plaintiff, that the Executive Department Defendants and the Law Department Defendants have been friends for years and that when Defendant Vacco lost his re-election bid, Defendant Doherty volunteered to and got Defendant Flynn another job with the State of New York. Second, Plaintiff asserts that the fact that after the March incident Defendants told

Plaintiff's supervisor and Plaintiff that the Governor's Office would be called even before Plaintiff was spoken to about the incident makes sense only if the Law Department Defendants wanted to intimidate Plaintiff.

These two assertions are insufficient to raise the specter of a conspiracy. Plaintiff, in effect, is trying to create a conspiracy out of innuendo, unrelated incidents and conclusory allegations, without any factual basis to support his claim. Such evidence is insufficient to maintain a § 1983 conspiracy claim. Accordingly, the Court grants the Executive Department Defendants' and the Law Department Defendants' cross-motions for summary judgment with respect to Plaintiff's § 1983 conspiracy claim.

## C. Plaintiff's state law claims

### 1. Eleventh Amendment concerns— official capacity claims

It is well-established that the Eleventh Amendment bars federal courts from entertaining suits against state officials based upon alleged violations of state law. *See Allen v. Cuomo,* 100 F.3d 253, 260 (2d Cir.1996) (citations omitted); *Young v. N.Y. City Transit Auth.,* 903 F.2d 146, 164 (2d Cir.1990) (holding that there is no " 'greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law' " (quotation omitted)); *Schallop,* 20 F.Supp.2d at 391 (finding that Eleventh Amendment required dismissal of a claim under New York Human Rights Law against the Department of Law and Vacco and Flynn in their official capacities).

In light of this principle, the Court finds that Plaintiff's state law claims against De-

fendants in their official capacity fail as a matter of law. Accordingly, the Court grants Defendants' cross-motions for summary judgment with respect to these claims to the extent they are asserted against Defendants in their official capacities.

### 2. Plaintiff's Article 78 claim

Irrespective of the merits of Plaintiff's Article 78 claim, the Court questions the propriety of maintaining a cause of action under Article 78 in federal court. If this Court were to exercise supplemental jurisdiction over Plaintiff's Article 78 claim, it would be required to "function as a state tribunal and conduct an Article 78 hearing." *Birmingham v. Ogden,* 70 F.Supp.2d 353, 372 (S.D.N.Y.1999). "Federal courts are loathe to engage in such activities, and will decline to usurp the statutory authority bestowed upon New York state courts by Article 78." *Reyna v. State Univ. of N.Y. Coll. at New Paltz,* No. 00–CV–733, 2001 WL 282953, *3 (N.D.N.Y. Mar.20, 2001). As the court noted in *Reyna,* district courts have refused to exercise supplemental jurisdiction over Article 78 claims in numerous recent cases, even where a plaintiff has one or more viable federal claims before the court. *See id.* (citing *Birmingham,* 70 F.Supp.2d at 372–73; *Verbeek v. Teller,* 114 F.Supp.2d 139, 142–43 (E.D.N.Y.2000); *Camacho v. Brandon,* 56 F.Supp.2d 370, 380 (S.D.N.Y.1999); *Lucchese,* 22 F.Supp.2d at 258. In light of the foregoing, the Court declines to exercise its supplemental jurisdiction over Plaintiff's Article 78 claim. Accordingly, the Court grants Defendants' cross-motions for summary judgment with respect to Plaintiff's Article 78 claim without prejudice.[5]

---

**5.** The Court notes that Plaintiff's time to commence an Article 78 proceeding in state court has not yet expired. Although a petitioner must commence such a proceeding "within

four months after the determination to be reviewed becomes final and binding," N.Y. C.P.L.R. § 217, Plaintiff commenced the pres-

### 3. Plaintiff's Mental Hygiene Law claim

None of the parties specifically addressed the merits of Plaintiff's claim under New York Mental Hygiene Law. Since Plaintiff did not address this claim either in support of his motion for summary judgment or in opposition to Defendants' cross-motions for summary judgment, Defendants, as well as the Court, assumed that Plaintiff had abandoned this claim. However, upon questioning at oral argument, Plaintiff stated that he had not abandoned this claim but simply was not seeking summary judgment with respect to thereto.

The Court has reviewed § 13.19(a) of New York Mental Hygiene Law and is puzzled as to the basis for Plaintiff's claim under this statute.[6] Section 13.19(a) provides that

> [t]he commissioner may, within the amounts appropriated therefor, appoint and remove in accordance with law and applicable rules of the state civil service commission, such officers and employees of the office of mental retardation and developmental disabilities and school and facility officers and employees who are designated managerial or confidential pursuant to article fourteen of the civil service law as are necessary for efficient administration.

N.Y. Mental Hygiene Law § 1319(a).

Clearly, § 13.19 only implicates the Commissioner of OMRDD and, therefore, the only Defendant against whom Plaintiff can possibly maintain this claim is Defendant Maul. Accordingly, to the extent that Plaintiff asserts this claim against the other Defendants in this action, the Court grants Defendants' cross-motions for summary judgment with respect to this claim.

To the extent that this claim remains viable against Defendant Maul, the Court questions whether § 13.19 provides Plaintiff with a private cause of action or merely serves as a statement of the Commissioner's authority with respect to personnel matters.[7] Rather than dismiss this claim outright, however, the Court will provide Plaintiff and Defendant Maul with an opportunity to address this issue in their pretrial submissions. Therefore, the Court instructs the parties to address the viability of Plaintiff's Mental Hygiene Law claim in their trial memoranda of law. The Court will then address this issue with the parties at the final pretrial conference.[8]

### IV. CONCLUSION

After carefully reviewing the file in this matter, the parties' submissions and oral

---

ent action within that four-month period. Pursuant to 28 U.S.C. § 1367(d), the statute of limitations "is tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." Since Plaintiff commenced this action within the four-month limitation period for Article 78 claims, he will still have an opportunity to pursue a remedy under Article 78 in state court.

6. Plaintiff's complaint merely states that his "termination was in violation of Mental Hygiene Law § 13.19." *See* Complaint at ¶ 89.

7. In other words, does § 13.19 provide for a separate cause of action or does it merely serve as a basis for Plaintiff's Article 78 claim.

8. If, after reviewing the applicable law, Plaintiff determines that he wishes to abandon this claim, he is to notify the Court and opposing counsel in writing of this decision prior to the time that the parties' pre-trial submissions are due.

arguments, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Plaintiff's motion for summary judgment is **DENIED** in its entirety; and the Court further

**ORDERS** that Defendant Vacco's and Defendant Flynn's cross-motions for summary judgment are **GRANTED** with respect to Plaintiff's First Amendment retaliation claim and Plaintiff's claims under the New York State Constitution, which mirror that claim; and the Court further

**ORDERS** that the cross-motions of Defendants Pataki, Doherty, Natoli, Finnegan, and Maul are **DENIED** with respect to Plaintiff's First Amendment retaliation claim and Plaintiff's claims under the New York State Constitution, which mirror that claim; however, the only relief available to Plaintiff is prospective injunctive relief; and the Court further

**ORDERS** that Defendants' cross-motions for summary judgment are **GRANTED** with respect to Plaintiff's § 1983 and § 1985 conspiracy claims; and the Court further

**ORDERS** that Defendants' cross-motions for summary judgment are **GRANTED** with respect to Plaintiff's state law claim for intentional infliction of emotional distress; and the Court further

**ORDERS** that Defendants' cross-motions for summary judgment are **GRANT-**ED with respect to Plaintiff's state law claims against Defendants in their official capacity; and the Court further

**ORDERS** that Defendants' cross-motions for summary judgment are **GRANTED** with respect to Plaintiff's Article 78 claim and this claim is **DISMISSED WITHOUT PREJUDICE**; and the Court further

**ORDERS** that Defendants' cross-motions for summary judgment are **GRANTED** with respect to Plaintiff's Mental Hygiene Law claim as to all Defendants except Defendant Maul; and the Court further

**ORDERS** that Defendants' cross-motions for summary judgment are **DENIED** with respect to Plaintiff's Mental Hygiene Law claim as to Defendant Maul and, therefore, the Court instructs Plaintiff and Defendant Maul to address the viability of this claim in their trial memoranda of law.[9]

**IT IS SO ORDERED.**

---

**9.** In sum, the only remaining claims to be tried in this action are Plaintiff's First Amendment retaliation claim and his claims under the New York State Constitution that mirror that claim against Defendants Pataki, Doherty, Natoli, Finnegan and Maul and Plaintiff's New York Mental Hygiene Law claim against Defendant Maul. Moreover, as stated at oral argument, the parties' pre-trial submissions must be filed on or before July 24, 2002, and responses to any motions *in limine* must be filed on or before July 29, 2002. The parties are to file all of their pre-trial papers in Syracuse, New York. The final pre-trial conference is scheduled for 4:00 p.m. on July 31, 2002, in Albany, New York, and the trial of this matter will commence on August 5, 2002, in Albany, New York.